Thomas *vs.* Kinsey.

8    421
113    970

No. 68.—James Thomas, administrator, &c. of George Bell, plaintiff in error, *vs.* John W. Kinsey, defendant.

[1.] Cross interrogatories are sufficiently answered, when the witness answers them according to a reasonable understanding of their object and meaning.

[2.] Interrogatories which have been read on a previous trial, without exception to their execution, cannot be excepted to at a subsequent trial. Failing to except at the first trial, *Held* a waiver of the exception which then might have been taken.

[3.] The sayings of an attorney who has sold a note belonging to his client, without authority, relative to his title to the note, not made at the time of the sale, *Held* to be inadmissible in a suit between the purchaser and the true owner for the note.

[4.] When it appeared from the return of the commissioners, that questions were put to the witness and answered, by a person purporting to be the attorney of one of the parties at the time of execution, the other party not being present: *Held,* that the interrogatories are defectively executed, and must be rejected.

[5.] *Held,* that one who buys a note, bill or other negotiable security, *bona fide,* and for value, *after it is due,* from one who has no title to it, acquires no title against the true owner.

Trover, in Hancock Superior Court. Tried before Judge Baxter, April Term, 1850.

This was an action of trover, by John W. Kinsey against George Bell, (and since his decease, James Thomas, his administrator,) for a promissory note for $900, made by Jesse B. Battle, payable to John W. Kinsey or bearer, and dated 16th October, 1844, and due at one day.

Plaintiff proved the demand of George Bell, and his refusal to deliver it up, on the ground that he had purchased the note of Nelson Spain, and paid him for it.

Plaintiff offered in evidence, the deposition of Nelson Spain, examined by commission. To which defendant objected, on the ground that the witness "failed to answer the second cross interrogatory, and artfully evaded the same." The question was, "What was the consideration of the note, and was there, or not, a demand to Stephen Blount settled at the same time? If yea, for what amount, and were you or not attorney for Blount and

Kinsey in the settlement of the same?" The answer was, "He received money as the consideration. Deponent does not know anything of a settlement between Stephen Blount at that time; but answers that he was attorney for Blount and Kinsey."

The Court overruled the objection, and defendant excepted.

The depositions were, that he knew the note, and is of opinion that it belonged to Kinsey at the time he saw it; that he received it from Kinsey for collection; that he did transfer it to Bell, and his impression is that Kinsey did not authorize him to do so, and that he does not know that Kinsey ever received any part of the consideration for which it was transferred. He received from Bell a valuable consideration, but did not trade the note as his own, to the best of his recollection. Did not recollect certain statement to Dickson and Thomas, inquired about. His impression is, that he had no authority to trade the note, and does not recollect ever saying that he had authority.

*David W. Lewis* being introduced and examined by plaintiff, as to the fact of Spain being the attorney of Kinsey in certain suits *vs.* William Battle and others, defendant's counsel proposed to ask the witness, "Whether, or not, he did not know that Spain claimed the note as his own, that he spoke to others about the note as his own, and that he offered to trade it to others as his own note?" Plaintiff's counsel objecting, the Court ruled out the testimony, and defendant excepted.

Defendant offered in evidence the deposition of Nelson Spain, in answer to the following interrogatories:

2d. Did you, or not, write the annexed letters at the time they bear date, and to the persons to whom they are addressed? (The letters referred to, were one to Jesse W. Battle, and the other to George Bell, in which he averred his right to sell the note, claiming it as a part of a fee or fees due him by Kinsey.)

3d. Was, or not, the letter addressed to Jesse B. Battle, in answer to a letter addressed by him to you? If yea, have you that letter in your power, custody or control? If yea, please annex a copy of it to your answers.

4th. Was or not the letter addressed to Bell, in answer to a letter addressed by him to you? If yea, have you the possession, custody or control of said letter? If yea, please annex the original to your answers. If you have not the possession of said letters, state the contents as near as you can recollect?

5th. Did not the letter last referred to, contain a statement by Mr. Bell, to the effect, "I am greatly astonished to learn that Kinsey claimed the note of Battle as his own. I should not have traded for it," &c. State the whole contents of the letter, as near as you can?

6th. What business did you undertake for Kinsey, as an attorney, and on what terms? How much was Kinsey to pay you? State all your contracts with him, and when made, and state particularly if any contract was, or not, made by you with his agent or himself, since you answered the letter to Mr. Bell.

7th. Did you, or not, in Sparta, before the close or compromise of the case with William Battle, say to James Thomas and William Dickson, that the half you got out of the two cases against William Battle, was to go to you for your fees; and did you, or not, tell William Dickson and his family, or some of them, in Sparta, after the cases were compromised, that the note you traded Mr. Bell belonged to you? State what you did tell either Mr. Dickson or his family?

At the time of the taking of the deposition, two other questions were propounded by "John A. Corwin, attorney for defendant."

To the reading of these depositions, counsel for plaintiff objected—

1st. Because they are too leading.

2d. Because defendant seeks to discredit his own witness.

3d. Because it is incompetent for defendant to prove what the witness said or did when he traded the note.

4th. Because the witness is interested.

5th. Because it appears that one Corwin attended the taking of the interrogatories, as an attorney for the defendant, and did propose interrogatories to the witness.

Defendant's counsel stated that he did not propose to read the answers to the questions propounded by Corwin, and proposed to show, by the deposition of Corwin, that he acted without fee, and was not employed in the cause.

The Court sustained the objections, and ruled out the testimony; to which decision defendant excepted.

Defendant's counsel requested the Court to charge—

1st. "That if they believe Bell traded for the note, and paid Spain a valuable consideration, without notice of plaintiff's rights, that he acquired a good title, and in order to destroy it, he must,

in taking the note, have acted *mala fide.*" The Court refused so to charge, and defendant excepted.

2d. " That trading for a note after it becomes due, is not of itself *mala fides,* but at most, a circumstance to raise a presumption, which may be rebutted by other circumstances."

The Court charged, " Though it may not be evidence of bad faith, the law has put a brand on the note over-due; they are considered dishonored; it is a circumstance requiring inquiry on the part of the person taking it; it is notice of defect of title, if taken after due, and the title of the real owner not impaired." To which charge and refusal, defendant excepted.

3d. " That if Spain held the note as an attorney for collection, he had a right to receive the money on the note, either from Bell or Battle." The Court charged, " An attorney has a right to receive payment from any third person; but if the money received is not in payment of the note, he can make no title to the note to the person so paying;" and defendant excepted.

The Court charged the Jury, among other things, " If you believe the note was placed in Spain's hands for collection, as an attorney, then whether Bell paid a valuable consideration or not, and with or without notice, and whether, or not, Bell knew that he held it as attorney, Spain could convey no title."

To this charge defendant excepted, and upon these several exceptions error is assigned.

JAMES THOMAS and N. G. FOSTER, for plaintiff in error.

A. H. H. DAWSON and CONE, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

The Court below did not, in our judgment, err in admitting the interrogatories of the witness, Spain, tendered by the plaintiff. The action was trover, brought to recover a promissory note by Kinsey, the original owner, against the administrator (Mr. Thomas) of Bell, who had bought it of the witness, Spain. The great question in the case was, whether the title of the purchaser was good against the title of the first owner and payee of the note. The plaintiff below took out a commission for the purpose of examining, and did examine Spain, relative to the owner-

ship of the note ; the time when it passed out of the possession of Kinsey, the first owner; as to who received the note from him ; for what purpose was it delivered to him, Spain ; whether he was authorized to transfer it ; to whom was it transferred, and whether the plaintiff *had received any part of the consideration for which it was transferred.* The defendant propounded to the witness several questions upon cross examination, and among them this, to wit: " *What was the consideration of the note,* and was there, or not, a demand to Stephen Blount settled at the same time." To this question the witness answered, " *He received money as the consideration.* Deponent does not know any thing of a settlement between Stephen Blount, at that time. He was attorney for Blount and Kinsey."

The objections to the admissibility of these interrogatories are two—

1. Because, although the commission issued before the death of Bell, yet it was executed after his death, and before his representative was made a party.

2. Because the second cross interrogatory (quoted above) was not answered.

As to the first exception, it is sufficient to say, that the commission issued during the life of Bell, and when there was a case fully represented in the Court, and the evidence was offered after the representative of Bell had been regularly made a party in that cause. In view of the exception, the time of executing the commission is immaterial. The defendant was deprived of no right, by reason of the fact that the commission had been executed after the death of Bell, and before his administrator had been made a party. The witness had been cross examined during Bell's life. The cross examination went out with the commission. What other right had the defendant touching the examination of the witness? The action did not abate by the death of Bell—it was only in abeyance.

[1.] The second exception is, also, to our minds, indefensible. Cross questions must be answered, it is true, and if not answered, the execution is defective ; and the right of cross examination, particularly in our loose mode of taking testimony by commission, ought to be most carefully guarded. In this case, it seems to us that the interrogatory referred to, (or that part of it in relation to the consideration of the note, the exception being, as we

VOL. VIII.   54

understood it, confined to that part,) was answered according to what we conclude was a reasonable understanding, on the part of the witness, of its meaning and object. Taking into view the character of the issue made between the parties—involving mainly the ownership of the note—the character of the direct examination, pointing as that does to this issue, and one of the direct questions, referring specially to the consideration paid to the witness by Bell, when the transfer was made, we conclude that the witness did understand, and had good reason to understand the question, "what was the consideration of the note," as pointing to the kind of consideration which he received upon the transfer of the note. According to that understanding of it, the question is fully answered. We think the question answered according to a fair construction of its meaning and intent, and that is sufficient.

[2.] Moreover, these interrogatories, as appears by the bill of exceptions, had been read on a former trial of the cause, without exception. If the exception were good, permitting the interrogatories to be once read without taking, it must be held a waiver.

[3.] The second error complained of is, the refusal of the Court to admit the testimony of David Lewis, proving the sayings of Spain, relative to his title to the note. The record discloses that Spain had received the note, as an attorney, for collection, and had sold it to Bell, the defendant's intestate. We see no reason why Spain was not a competent witness in the cause. His sayings going to support the title to the note in the defendant were, therefore, inadmissible. Had he been proven to be the agent of the plaintiff, authorized to sell the note, his sayings relative to the title, at the time of the transfer, would have been admissible, as part of the *res gestæ*; but such agency was not proven.

[4.] The defendant tendered in evidence, the interrogatories of Spain, for the purpose of laying the foundation for an attack upon his credibility. They were objected to by the plaintiff, upon the ground that it appeared from the interrogatories themselves, that questions other than those propounded when the commission issued, were put by one John A. Corwin, attorney for the defendant, and the objection was sustained. The ruling out of these interrogatories, constitutes the third ground of alleged

Thomas *vs.* Kinsey.

error. Upon examination, we find that the questions originally propounded, were signed by James Thomas, who had been made a party to the suit, as the administrator of Bell. The commissioners certify to the fact of several additional questions being put to the witness by John A. Corwin, attorney for defendant. They return the questions and the answers to them. According to their return, the questions were put to the witness by an attorney for the defendant, and we are constrained to infer, after the commission had issued—indeed, at the time of its execution. The decision of the Court is sustainable upon two grounds—

1. The Act of 1799, requires a party desirous of taking the testimony of a witness out of the County or State, to give ten days' notice to the adverse party, *and to serve him with a copy of the interrogatories.* When this is done, and not before, is he entitled to a commission. In this case, the Act has not been complied with. The interrogatories propounded by Corwin, were *not served upon the adverse party ten days before the issuing of* the commission; indeed, at no time were they served upon him. The reason of this requirement is very clear. It is to enable the adverse party to cross examine the witness in relation to all the subject matters of the direct examination. *Prince,* 425.

2. The presence of counsel for one of the parties, taking part in the examination by propounding questions, prevents its impartiality, and vitiates the whole. Our law makes no provision for the presence of the parties; the examination is in writing, confined to the questions put to the witness before the commission issues, and confided to impartial commissioners. The commission issues in blank, and is filled by the party suing it out. At best, this is a very unsafe mode of taking testimony, in which the party seeking it has the advantage. We cannot guard it too carefully from abuse. In *Glanton vs. Grigg,* this Court held, that depositions taken by a student at law of an attorney in the cause, and in the office and presence of the attorney, are inadmissible. 5 *Ga. Rep.* 424. See, also, *Tillinghast, Starke & Co. vs. Walton,* 5 *Ga. Rep.* 335. This is a stronger case than either of these. Manifestly, impartiality in taking the depositions cannot be presumed, when one party is present by his attorney, and participating in the examination, the other being absent. It was said in the argument, that this is not an objection to the execution of the interrogatories, but to the testimony itself, and, therefore, the an-

swers of the witness to the questions propounded by Corwin only, should be rejected, and the remainder of the depositions admitted. Not so. The objection lies to the execution of the commission. It is not impartially executed. Had Corwin, the attorney for the defendant, being present, asked no question, the whole would be rejected; much more will the whole testimony be rejected in the case made by this record.

[5.] The main question in this case is, whether Bell, the purchaser of this note, *bona fide* and for value, after it was due, from Spain, who had no title to it, acquired a title good against the plaintiff, who is the payee and true owner. The plaintiff in error maintains that he did. The Court below held that he did not, and our judgment is with the presiding Judge. We are aware that the adjudicated cases on this point, in the English and American books, are few; for the reason, no doubt, that it has been considered too plain to admit of question. This assertion may appear to the learned counsel for the plaintiff in error extravagant, holding as they did, that the question was one of subtlety and great magnitude. This cause would have been, without question, one of vast magnitude, had this Court adopted and established the doctrine of the counsel; because, in that event, we would have ordained a *new rule of property*—a rule, as we think, up to this moment unknown to the Common Law. The judgment, however, which we have felt it our duty to render, is entitled to no merit other than that of consistency with the long established law. The apparent difficulty of the question has, I apprehend, grown out of the blending of it with others akin to, but not identical with it. For example, the rule in relation to the title of the holder of a note or bill, bought *bona fide* and for value, *before maturity*, of one having no title, as against the rightful owner, is well established, and is in accordance with the views entertained by the counsel. In such a case, the title of the purchaser is protected, unless charged with *mala fides*. This question is, in many particulars, analagous to that now under review. Under what circumstances the title of a purchaser, *bona fide* and for value, of a bill or note *not yet due*, will be protected, has been, and is to this day, a matter of much discussion in the books; and the language of Judges and elementary writers in these discussions, is not always very discriminating. Being applicable to cases of notes purchased *before maturity* only, for want of distinct-

Thomas *vs.* Kinsey.

ness, it often seems to be applicable to cases of notes or bills purchased *generally*, and has been held applicable to cases, therefore, of notes or bills bought *after maturity;* when, in truth, I have no doubt both the Courts and the elementary writers have believed the distinction between these cases to be so well established, and so generally recognized, as to require no careful discrimination.    In justice, however, as I shall attempt to show, to more than one of our own great Jurists, and I refer more particularly to *Kent* and *Story,* I must add that they have maintained the distinction with intelligible precision ; only, perhaps, too closely following the English formulary, in only *negatively* excluding cases of notes and bills purchased *after due.*    Again, there is voluminous discussion in the books, relative to the doctrine of equities, as between the makers of notes and holders, acquiring title both before and after maturity ; all of which has just nothing to do with the question of *title* between the holder, buying of one having no title, and the true owner.    From such causes, no doubt, has originated the apparent sanction which the opinions held by the counsel for the plaintiff in error in this cause, has received from the books.    It will be seen, however, that this sanction is merely apparent.    My duty, then, will be to isolate this question from others; give it its real position in the science ; and in that position, determine upon what principles and what authorities it rests.

The general rule of the law of this State and of Great Britain is, that no man can acquire a title to a chattel personal, from any one who has himself no title to it.    A contrary rule would subvert the foundations upon which property rests, violate natural justice, and make the law the agent for outraging the first principles of morality.    If property found or stolen, or obtained by violence or fraud, could be sold, and the title in the purchaser be maintained against the real owner, then would the law pander to injustice and patronise immorality.    However innocent the purchaser under such circumstances may be, and however great his loss may be, and although he is, in fact, the victim of villainy, his title is subordinate to the title of the true owner. He gets the title of his vendor and no more, which must yield to the title of the owner, whenever that is established.    This rule is of general application, and embraces all kinds of personal property—applying, generally, to notes, bills and other negotiable se-

curities, as well as to negroes, stocks or horses.    To this general
rule there are a few exceptions.    By the Common Law, property
sold in market-overt, is not embraced in it; and by the Common
Law, and by the judgment of this Court, negotiable instruments,
transferable by delivery, and *when not yet due*, are an exception.
The law touching this last named exception, was maturely consi-
dered in *Mathews vs. Poythress*, 4 *Ga. Rep.* 287.  The rule set-
tled in this case, as we then thought and still think, according to
authority, is this : " The purchaser of a bill, note or other nego-
tiable security, transferable by delivery, who takes it *before it is
due*, from one who himself has no title, *bona fide* and for value,
acquires a good title, but his title will be defeated by *mala fides*
in the purchase." What it is especially necessary to note is, the
general rule, embracing within its wide range, bills, notes and
other negotiable securities, as well as all chattels, and the excep-
tion, which embraces in its restrictive scope, negotiable securities
which are transferred before they fall due.  It could avail nothing
now to question the equity or the morality of this exception.
The equity of it has been put upon the principle, that where one
of two innocent persons must suffer loss, by the fraud of a third
person, it must fall upon him whose credulity, or negligence, or
misplaced confidence, has enabled such third person to perpetrate
the fraud.    The principle is not questioned.   But before the ex-
ception can be sustained upon it, the case which is brought with-
in the exception, ought to be the case contemplated by the prin-
ciple; that is to say, the negligence, credulity or misplaced con-
fidence ought to be demonstrated.    But in the application of the
rule upon which the exception goes, are these or any of them,
always required to be demonstrated ?    The answer may be given
by looking to the cases made in the books.    For example, that
faith in agents which is so necessary to commerce as to be its
soul, is the *misplaced confidence* by virtue of which, in many cases,
the honest owner loses his property ; for, I apprehend that there
are numerous cases where a commercial agent having, without
authority, sold securities not due, belonging to his principal, and
appropriated the proceeds, the title of the purchaser has been
protected.    I will not pursue this inquiry farther.   The true
ground upon which the exception rests, is commercial expedi-
ency.    It is to promote the ready circulation, and to extend the
credit of negotiable paper, and in so doing subserve the great

interests of commerce. The exigencies of commerce, require that they should become practically an equivalent to, and representative of money. Such character they have, to a great extent, and have derived it, in no small degree, from that ready circulation which the exception gives to them. That it promotes the interest of all mercantile communities, there can be no doubt. It is beneficially applicable to our own State—not solely mercantile, agricultural or mechanical. If it be conceded, (what I do not assert,) that it works injustice to the owner, yet it is one of those instances in which public good is promoted by individual injury. It is, at all events, established by authority, overwhelming in character and in amount.

Does this exception extend to notes, bills and other securities *past due?* It does not. There are cases, which upon slight perusal, seem to be cases of *over due* securities; but upon careful examination, they are found to be cases of *premature* securities. Such is the case of *Peacock vs. Rhodes, (Douglass,* 636,) relied upon by Col. *Foster.* I think it may be safely said, that there is not to be found a single judgment of a single Court of any authority, which has extended it to paper *over due.* Certainly I have found no such judgment. Then, the question here made, is disconnected with all the learning in the books, which applies to the exception I have been considering. Bills, notes and all other negotiable securities, after they are due, are subject to the great property rule first announced. That is, that he who, *bona fide* and for value, buys it from one having no title, acquires none. He buys with it the title of his vendor, and does not get a title better than the rightful owner.

We are invoked to extend the exception to this general law of property, to paper transferred after it is due. Upon expediency we ought not, and upon authority we dare not, respond favorably to the invocation. It is argued, that the same necessity of commerce, which at first suggested, and which now justifies the exception as to paper *not due,* will authorize its extension to paper *over due.* The reason for the one, it is insisted, is equally as strong as the reason for the other, and it is asked wherein consists the grounds of the distinction? To which it may be replied, that the demand for increased negotiability in notes and bills, particularly in Georgia, is fully satisfied by the one exception. The law merchant, as it stands, is adequate to all the requirements of busi-

ness in our State, and I see no reason why the Courts should legislate notes and bills over due, into a more active circulation, at the expense of a fundamental law of all personal property. But there is reason for the existing exception, *to be found* in the character of a paper *not due*, which is not found in the character of a paper *past due;* and in the rights and obligations of the parties on a note *not due*, which are not found in the rights and obligations of the parties to a note *past due*. The utility of notes, bills, &c. grows out of their negotiability, and they are negotiable because, in the language of Mr. *Story*, they are practically " equivalent to, or the representative of money." Now, in a very eminent degree, they are equivalent to, and the representative of money, *before they are due*. *Before maturity* they stand unimpeached. The presumption of law is, that they will be paid at maturity, and because of this presumption, they pass freely from hand to hand, as the representative of money. Bills, particularly, in practice, are made to represent money. By them exchanges are conducted; estates transmitted from empire to empire, and, indeed, the affairs of foreign commerce chiefly transacted. It would be a curious and interesting inquiry, to attempt the ascertainment of the amount of the capital of the world, at any one time afloat in bills and other negotiable securities running to maturity. Confidence in them is the basis of commerce. *Before maturity*, the purchaser is not subject to the equities attaching to the paper, between the original parties, unless he buys with notice of those equities, and such notice must be carried home to him, before they can be let in against him. Such being the legal character of notes and bills *before maturity*, there is reason found in that character, for facilitating and extending their circulation, by protecting the title; and it was on these accounts that the British Courts laid upon this title their strong hand and *created* the exception. It became the law of Georgia by our Adopting Statute, and is the law, as I suppose, of every State in the Union. But how stands the same bill or note *after maturity?* The time of payment being past, the presumption of the law is, that there is some good reason why it was not paid. It is not genuine; there was no consideration, or it has failed or was illegal; there are off-sets or other equities against it; or the parties liable are not able to pay. It goes into circulation dishonored—*branded with a protest*. The purchaser takes it upon the credit of the in-

dorser, and subject to the equities.  It is not, and in the character it wears, it ought not to be considered as fully, by large odds, the equivalent or representative of money, as it was before maturity. Why, then, should its negotiability be extended by protecting the title of the holder?  Indeed, instead of promoting the interests of commerce, by fostering and increasing the circulating quality of such paper by protecting the title, the reverse effect would result.  Commerce would be injured by extending the circulation of paper not entitled to credit.

It is said that much of this reasoning, although applicable to notes and bills negotiable by indorsement, does not apply to notes payable to bearer, and negotiable by delivery, or to notes and bills payable to order, and indorsed in blank.  It is urged that the title passes by delivery—goes with the note—is a necessary element of the paper itself, and is evidenced by possession; that when one transfers such paper by delivery, he does not become a party to it, and is not liable on it, and that, therefore, the holder cannot look to him, as he may to an indorser—he does not take it on the credit of the transferer.  From all of which the inference is drawn, that the title thus acquired is good in the holder, to such a note or bill *over due.*  Now, all these things are generally true.  The title passes by delivery, and possession is evidence of it.  So of a horse; yet the title to the horse and the bill does not, thereby, become unimpeachable.  The possession in either case, is only *prima facie* evidence of title, and may be resisted.  It (the title) may be shown to have been acquired through one having no title.  *Story on Prom. Notes,* §43.  *Story on Bills,* §60. *Chitty on Bills, ch.* 5, *pp.* 180. 252. 8*th edit.   Bailey on Bills,* 5*th edit. ch.* 1, §10, *p.* 31.

Again, although the transferer of a note or bill, negotiable by delivery, is not liable to the transferee on the note or bill, he is not, by any means, free from responsibility.  Unless it be expressly otherwise agreed, he warrants by implication, that he is the lawful holder, and has a just and valid title to the instrument, and a right to transfer it by delivery.  He incurs liabilities on other grounds, which I need not state.  *Story on Prom. Notes,* §118, *p.* 127.  *Ib. on Bills,* §§109, 111.  I do not consider that notes and other securities, negotiable by delivery, in reference to this question, stand upon grounds different from such as are only negotiable by indorsement.

I close this discussion by referring to a few authorities which sustain our judgment. Mr. *Story*, when discussing the rights of the holder, says, "Hence it is that a *bona fide* holder for value, without notice, is entitled to recover upon any negotiable instrument, *which he has received before it has become due*, notwithstanding any defect or infirmity in the title of the person from whom he derived it."

Ch. *Kent* says, "The *bona fide* holder can recover upon the paper, though it came to him from a person who had stolen or robbed it from the true owner, provided he took it innocently, in the course of trade, for a valuable consideration, and *not over due*," &c.

Similar language is used by other elementary writers, which I forbear to quote. In relation to these elementary extracts, I remark, that the writers are discussing *the title* of the holder, when derived from one *holding no title*, and one of *the conditions* upon which they make that title good is, *that it be acquired before the paper is due.* The inference is logical and irresistible, that if the title is acquired *after it is due*, it is not good. 1 *Story on Prom. Notes*, §191. 3 *Kent's C.* 78. *Baily on Bills*, 524, 528.

The case of *Down vs. Halling and others*, (4 *Barn. & Cress*, 330. 10 *Eng. Com. Law R.* 347,) is an authority in which the very question I have discussed is considered and adjudged. That was an action of assumpsit for money had and received, brought by the true owner of a check against a purchaser, who bought it after it was due, from one who had no title, and to which purchaser it had been paid. The Court likened the check to a bill *over due*, and held that the purchaser acquired no title, and was, therefore, liable to the plaintiff. *Bayley*, J. said, "There is no question whatever in the case, if the distinction between bills over due and not due, is adverted to. If a bill, note or check be taken after it is due, the party taking it can have no better title to it, than the party from whom he takes it, and, therefore, cannot recover upon it, if it turns out that it had been previously stolen or lost. This is, therefore, just like the case of a bill taken after it is due, and the party taking it has no better title than the person from whom he took it, and cannot recover upon it."

*Holroyd*, J. held the same opinion. The case stood over for consideration upon some point in it, and afterwards, *Abbott*, C. J. among other things, said, "It was proved that the check was

given to the plaintiff by his brother. By that delivery the property in it vested originally in the plaintiff. It farther appears that the check came into the possession of the defendant five days after its date. We are of opinion that an instrument of this kind, coming into the hands of a party so long after its date, is to be considered in the same light as a bill of exchange over due, and in such case it is incumbent on the party who takes the instrument under such circumstances, to show that the party from whom he took it had a good title to it."

The case of *Emmerson vs. Crocker,* (5 *New Hamp. R.*) is a case immediately upon the question, and deciding that the holder of a note, transferred to him *after it was due,* by one having no title, acquired no title to it.

In a late case decided in Connecticut, (17 *Con. R.* 511,) *Clarke vs. Sigourney,* where A gave his note to B, payable to B or order, on a certain future day, which lay in his hands until his death, which was long after it fell due, and after his death came into the hands of C, his executrix, with the name of B indorsed in blank on the back of it, who delivered it to D, in the state in which she found it, for a valuable consideration, it was held, that C, as executrix or otherwise, had no authority to deliver the note as a note indorsed by B; that D consequently had acquired no legal title to it, and that *as the note came into the possession of D after it fell due, it was subject to the defence of a want of title in him.*

I need scarcely add that the judgment now pronounced does not, in any way, interfere with the negotiability of over due notes and bills and other securities, by any fair and legal transmission of title from the owner.

Let the judgment be affirmed.