Decided 23 April, 1900.

**BENSON *v.* KELLER.**

[ 60 Pac. 918.]

PLEADING—MULTIFARIOUSNESS.

1. The subject of multifariousness in pleading is reviewed, and the conclusion reached that much must be left to the discretion of the court to determine whether a bill is multifarious, arising from a misjoinder of defendants therein.

MULTIFARIOUSNESS OF BILL TO CANCEL INSTRUMENTS.

2. A bill to cancel several duebills alleged to have been fraudulently procured from plaintiff by one of the defendants, and then transferred to other of the defendants severally, is not multifarious, though some of the defendants may be put to additional expense in trying the case away from their home county.

FRAUD—ADEQUATE REMEDY AT LAW.

3. B, being in possession of sundry valuable duebills, was induced by K, through certain fraudulent representations, to deliver them to him for the purpose of paying a debt of B's, but the duebills were hypothecated for K's personal debts. B thereupon began a suit in equity to secure a return of the duebills.

*Held,* that an action of damages against K for deceit would not be as efficient as the remedy in equity, even if K was solvent: *South Portland Land Co.* v. *Munger,* 36 Or. 457, cited.

NEGOTIABLE PAPER—BONA FIDE HOLDER—FOR VALUE.

4. A holder of negotiable paper is not a purchaser for value where he took the paper before maturity, without notice of any infirmity, under an agreement to make future advances, but made the advances after notice of an infirmity.

NEGOTIABLE PAPER—BONA FIDES—NOTICE OF FRAUD.

5. A statement to a holder of negotiable paper by the maker that he had been requested by the person in whose interest the paper was executed to withhold payment, together with a statement by the attorney of the maker that the paper had been obtained by fraudulent practices, and that he intended to sue at once for the return of the paper, is sufficient notice of infirmity in the paper to cause the holder to make further advances on it to his assignor at his peril.

From Multnomah: JOHN B. CLELAND, Judge.

The facts out of which this controversy arises may be briefly stated as follows: The Columbia Packing Co. is a corporation organized with a capital stock of $15,000, divided into shares of $100 each, only eighty of which were subscribed,—A. A. Bonney taking forty; E. C. Phirman twenty; and George Keller, twenty. A meeting of the stockholders was held September 16, 1890, at which they were all elected directors, and on the same day the directors, at a regular meeting, elected Bonney president, Keller secretary, and Phirman treasurer; but no regularly called meeting of the stockholders or directors was thereafter held until December 27, 1894. The corporation in the meantime engaged in the business for which it was organized. About November, 1890, Bonney pledged twenty shares of his stock to A. V. Anderson, to secure the payment of $1,500, and the balance of it in March, 1891, to B. S. Bonney, to secure the payment of $3,800. Thereafter Anderson and B. S. Bonney assigned their evidence of indebtedness, together with the stock pledged for its security, to C. W. Rice; and later, but prior to December 7, 1894, Rice began proceedings for the foreclosure of his lien upon the stock, and on March.15, 1895, became the owner thereof by purchase at sheriff's

sale. On September 25, 1890, Phirman and Keller pledged
their stock to A. A. Bonney to secure the payment of cer-
tain sums advanced,—$1,800 to Phirman, and $1,703 to
Keller. In October following, Bonney transferred his evi-
dence of indebtedness, together with the stock pledged, to
one S. W. R. Jones, to secure his indebtedness to Jones.
On May 2, 1892, Bonney, Phirman, and Keller entered
into an agreement whereby they mutually stipulated and
agreed that each should receive an equal share of the
profits earned by said company subsequent to September
2, 1891, notwithstanding the inequality in the number of
shares of capital stock appearing to the credit of each
upon the company's books, and that, as soon as the cer-
tificates of stock theretofore issued and pledged should
be redeemed, the same should be canceled, and a certifi-
cate issued to each of the parties for an equal number of
shares, and that the parties should thereafter be equal
owners of the capital stock of the company.

On December 7, 1894, Keller entered into a written
agreement with one R. H. Guthrie, whereby, for a con-
sideration named, he sold, assigned, and transferred to
Guthrie all his interest in and to twenty-six and two-
thirds shares of the capital stock of the company, reserv-
ing to himself all the accrued profits of said company's
business represented by the uncollected book accounts,
notes, and demands due to said company on November
16, 1894, which should thereafter become dividends upon
said shares of stock. The document then recites the
aggregate of the outstanding accounts, the amount of
present indebtedness, the manner in which the outstand-
ing stock of the company was then held, and the agree-
ment of the stockholders concerning the same. The
twenty shares of capital stock theretofore pledged by
Keller to A. A. Bonney were accordingly assigned to
Guthrie, who on December 27, 1894, was duly recognized

as·a stockholder·of the company at a regularly called meeting of the stockholders and directors. On the said seventh day of December Keller attempted to secure from the company an agreement containing a stipulation upon its part to collect as soon as practicable sufficient of its outstanding accounts, notes, and demands to satisfy the indebtedness incurred prior to said November 16, 1894, amounting to $2,011.83, and transfer one-third of the remainder thereof, towit, $11,657.42, or $3,885.80, to Keller, and thenceforth hold him harmless from said indebtedness; Keller agreeing upon his part that upon the assignment to him of the said one-third of the accounts, notes, and demands, he would release the company from all liability to him for dividends. This agreement purports to be signed by R. H. Guthrie, president *pro tem.*, and George Keller, and has the corporate seal attached. At this time T. C. Benson, the plaintiff herein, was indebted to the company in a sum largely in excess of $3,000, and J. G. & I. N. Day were indebted to Benson in a sum much larger than that amount. Thereafter, on the twenty-fourth and twenty-seventh days of December, 1894, Keller, by representing to Benson that he was authorized to collect of the amount due from him to the company the sum of $3,000, and that he would procure from the company a receipt and release for that amount, induced him to procure from J. G. & I. N. Day their sixteen duebills, payable to the order of Keller, eight of which, aggregating $1,500, were to mature January 15, 1895, and the others, amounting to $1,500, to mature February 15, 1895. Keller transferred the duebills falling due January 15 to The Dalles National Bank, as collateral security for future advances, and the others to Bissinger & Co., of Portland, Oregon. Benson brings this suit to have the duebills surrendered up and canceled, and joins with The Dalles National Bank, as de-

fendants, George Keller, Bissinger & Co., J. G. & I. N. Day, and the Columbia Packing Co. The decree of the court below, in so far as it concerns the controversy here, was in favor of the plaintiff and against The Dalles National Bank, and the bank appeals.        AFFIRMED.

For appellant there was a brief over the name of *Snow & McCamant,* with an oral argument by *Mr. Wallace McCamant.*

For respondent there was a brief over the name of *Carey & Mays,* with an oral argument by *Mr. Franklin P. Mays.*

MR. CHIEF JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. Objection is made, through the interposition of a demurrer to the complaint, that several causes of suit have been improperly united, in that it states a cause of suit against Bissinger & Co., of Portland, and one against The Dalles National Bank, of The Dalles, and that neither of these parties has any interest in the cause stated against the other. Hence, it is claimed that the complaint is multifarious. Objections on account of multifariousness seem to to divided primarily into two classes : (1) Those which go to a misjoinder of two or more independent and incompatible causes of suit ; and (2) where several matters of a distinct nature are stated and demanded against different parties. The two kinds of objections are well illustrated by Lord Chancellor COTTENHAM in *Campbell* v. *Mackay,* 1 Mylne & C. 603, wherein the distinction is clearly stated. He says : "Frequently the objection raised, though termed 'multifariousness,' is in fact more properly misjoinder ; that is to say, the cases or claims united in the bill are of so different a character that the court will not permit them to be liti-

gated in one record. It may be that the plaintiffs and defendants are parties to the whole of the transactions which form the subject of the suit, and nevertheless those transactions may be so dissimilar that the court will not allow them to be joined together, but will require distinct records. But what is more familiarly understood by the term 'multifariousness,' as applied to a bill, is where a party is able to say he is brought as a defendant upon a record, with a large portion of which, and of the case made by which, he has no connection whatever." See, also, *Gartland* v. *Dunn*, 11 Ark. 720. It is said in *Alexander* v. *Alexander*, 85 Va. 353, 363 (7 S. E. 335, 339, 1 L. R. A. 125, 127), "that a bill will always be deemed multifarious where several matters joined in the bill against one defendant are so entirely distinct and independent of each other that the defendent will be compelled to unite in his answer and defense different matters wholly unconnected with each other, and as a consequence the proofs applicable to each would be apt to be confounded with each other, and great delays might be occasioned respecting matters ripe for hearing by waiting for proofs as to some other matter not ready for hearing; or, again, where there is a demand of several matters of a distinct and independent nature in the same bill, rendering the proceeding oppressive because it would tend to load each defendant with an unnecessary burden of costs, by swelling the pleadings with the statement of the several claims of the other defendants, with which he has no connection." A cardinal evil which the objection is designed to obviate is that of putting the parties to great and useless expense, and this has relation as it may affect either party to the suit. In *Attorney-General* v. *Cradock*, 3 Mylne & C. 85, it was said: "The object of the rule against multifariousness is to protect a defendant from unnecessary expense, but it would be a great perversion

of that rule if it were to impose upon the plaintiffs and all the other defendants the expenses of two suits instead of one.''

It is here insisted that by suing Bissinger & Co. in Portland, and making The Dalles National Bank, and the other defendants residing at The Cascades and The Dalles, parties, and causing them to make their defenses in Portland, the plaintiff is putting them to an unwarranted and needless expense. No doubt, it has been more expensive for them to litigate in Portland than it would have been at The Dalles, and this emphasizes the pertinency of the reason assigned for the objection. The difficulty of laying down any rule of universal application, as it respects the subject of multifariousness, is suggested by many of the authorities. The cases upon the subject are extremely various, and the courts in deciding them, seem to have considered ''what was convenient in particular circumstances, rather than to have attempted to lay down any absolute rule :'' *Gartland* v. *Dunn*, 11 Ark. 720. The objection does not go to the merits of the cause, but relates more nearly to a question of convenience in conducting the suit ; and, in a large measure, it simply calls for an exercise of discretion in deciding whether both or all the causes of suit set forth in the bill shall be tried in a single suit, or be split up, and the parties relegated to the bringing of two or more suits for the accomplishment of their purposes, or whether a. defendant who is a necessary party in respect of one or more matters suggested by the complaint has a sufficient interest in or connection with the other matters involved to make him a proper party in respect to such other matters : *Bolles* v. *Bolles*, 44 N. J. Eq. 385 (14 Atl. 593). Mr. Justice DEPEW, in *Lehigh Val. R. R. Co.* v. *McFarlan*, 31 N. J. Eq. 706, 758, says : ''The rule with regard to multifariousness, whether arising from the misjoinder of causes

of action or of defendants therein, is not an inflexible rule of practice or procedure, but is a rule founded in general convenience, which rests upon a consideration of what will best promote the administration of justice without multiplying unnecessary litigation, on the one hand, or drawing suitors into needless and unnecessary expenses, on the other." See, also, *Stevens* v. *Bosch*, 54 N. J. Eq. 59 (33 Atl. 293). Upon the whole, it would seem· that each case must be examined with reference to its own particular and peculiar features ; and, "much," as Mr. Justice STORY remarks in *Oliver* v. *Piatt*, 44 U. S. (3 How.) 333, 412, "must necessarily be left—where the authorities leave it—to the sound discretion of the court." See, also, *Gaines* v. *Chew*, 43 U. S. (2 How.) 619 ; *Barney* v. *Latham*, 103 U. S. 205, 215 ; *United States* v. *Union Pac. R. R. Co.* 98 U. S. 569, 604.

2. When the whole case is considered, it can hardly be said that the defendant The Dalles National Bank has been brought up on a record "with a large portion of which, and the case made by which, it has no connection whatever :" *Campbell* v. *Mackay*, 1 Mylne & C. 603. It is very apparent that it has no connection with a portion thereof, as the purchase of the duebills by Bissinger & Co. is a different transaction from that which the defendant The Dalles National Bank must necessarily prove in order to establish the *bona fides* of its purchase from Keller. But it is only at the point where the bills were hypothecated that the interest of the parties diverges, in so far as the nature of the proof is concerned. They had their origin in one and the same transaction, and whatsoever of fraud there is, or may have been, attending the issuance and procurement of the one set, the other series is subject to the like objection. In short, the history of each of said series of duebills is one and the same up to the time of their hypothecation to different persons ; and

the ultimate question with which we have to deal is whether the cause should be dismissed because the attempt has been made to secure a decree touching all these bills in one suit, while the ownership of all is not in one and the same party. It is very apparent that both these defendants have direct and uniform connection with the whole record, barring the one exception named. Even a technical adherence to Lord Cottenham's second rule would not seem to require a dismissal. But, however that may be, the interests of the defendants The Dalles National Bank and Bissinger & Co. are not so diverse and disconnected, and the expenses of this proceeding so excessive, as to require separate suits. The demurrer for multifariousness does not go to the merits of the controversy, but calls upon the plaintiff to go out of court, split up his demands, and begin anew. It is the policy of the law that every case should be speedily tried upon its merits, whenever it can be without violation of positive and well-established rules which must be observed, to the end that the law itself shall be certain and of uniform application. To put the plaintiff out of court could not better subserve the ends of justice than to determine the whole controversy now. So the demurrer, as it regards the question here stated, will be overruled.

3. The defendant The Dalles National Bank controverts the right of the plaintiff to maintain a suit in equity, because, it is argued, plaintiff has a plain, speedy and adequate remedy at law for damages upon an action for deceit, it not having been alleged or proved that the defendant Keller was insolvent. Equitable jurisdiction is invoked upon the ground that a fraud has been practiced upon the plaintiff in procuring from him the duebills in question. All the parties who were in any way interested in the transaction which gave utterance or existence to them are made parties, and were before the

court below, so that all matters pertaining thereto were capable of adjudication between them, and in that forum. In many cases founded upon fraud, equity and law have concurrent jurisdiction; and it is said that, where the primary right, interest or estate is legal, and the remedy sought is equitable, the latter jurisdiction exists, but will not be exercised where the legal remedy is plain, adequate and complete: 2 Pomeroy, Eq. Jur. (2 ed.) § 911; 8 Am. & Eng. Enc. Law (1 ed.), 651. The fundamental principle upon which is based the right to be remitted to a court of law is the constitutional right of a trial by jury. This is a sacred guaranty to every person whose privilege it is to apply to the tribunals of justice for relief from his grievances, and the courts are likewise bound to its faithful and punctilious observance: *Phipps* v. *Kelly*, 12 Or: 213 (6 Pac. 707); *Love* v. *Morrill*, 19 Or. 545 (24 Pac. 916); *Grand Chute* v. *Winegar*, 82 U. S. (15 Wall.) 373. But, unless his remedy at law is as adequate and complete as that which equity affords, it would be contrary to the plainest dictates of justice to require a resort thereto; nor was it the purpose of such constitutional guaranty to cut off or circumscribe a more speedy and adequate relief. The rule goes yet further: "The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances:" *Gormley* v. *Clark*, 134 U. S. 338, 349, (10 Sup. Ct. 554, 557); *South Port. Land Co.* v. *Munger*, 36 Or. 457 (60 Pac. 5).

True, the plaintiff has a remedy at law against Keller for deceit, but he has also a remedy in equity, and the question is whether the former can afford plaintiff as effectual relief as the latter. The purpose of this suit is to recover possession and procure a cancellation of the due-

bills which, it is alleged, were obtained by the fraud of defendant Keller. The complaint proceeds upon the theory that these bills have not yet been paid by the makers, and that the parties into whose hands they have come acquired them with notice of the fraud, and the equities existing in favor of the plaintiff. It may be said that the initial purpose of the suit is to arrest the intended injury and to prevent an injustice being done, by laying hold of the duebills themselves and requiring their cancellation, and thus restoring plaintiff to the condition in which he was prior to the obtainment thereof from his debtors. The suggestion that the duebills were not the obligations of plaintiff does not alter the case, as they were obtained through fraudulent practices, and the amount of the debt represented thereby was canceled in such a way that he could not have relief against his creditor, the Columbia Packing Co. The plaintiff has been wronged, and the defendant Keller was the primary cause of that wrong ; and this suit is now brought to avert the consummation of the scheme, by having the evidence of indebtedness canceled, and plaintiff reinstated as a creditor of J. G. & I. N. Day, and thereby place him in the position in which he stood before the consummation of the fraud. "If an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it, since he can only retain it for some sinister purpose :" 2 Story, Eq. Jur. (13 ed.) § 700. It seems to us that the case comes very clearly within the cognizance of equity, and that, while the plaintiff may have his remedy against Keller for damages, yet he must submit to the payment of those fraudulent duebills by his debtors, and waive his right to have them canceled, and the money, which J. G. & I. N. Day are ready and willing to pay when the controversy is at an end, placed to his credit. He can have no relief at law so adequate as this.

We come now to the question whether, and to what extent, the bank is a *bona fide* holder for value of the duebills in controversy. In view of the conclusion we have reached upon this part of the case, it may be conceded that these bills are negotiable, in a commercial sense, and that the bank should be protected to the full measure or extent in which it is entitled to be denominated or considered a *bona fide* holder. Preliminarily, it is suggested that, as the burden of proof rests with the plaintiff to show that the bank is not a *bona fide* holder for value, the allegations of the complaint are insufficient to support proof to that purpose. The allegations are, in substance, that Keller indorsed the duebills, and delivered the same to said Dalles National Bank; that said transaction between Keller and the bank was not a sale of said duebills; that said bank claims some interest therein, but refuses to state what the nature of its interest is; that said interest, if any, is subject to the plaintiff's rights and equities in the same; and that "said bank took and received said duebills with full notice and knowledge of plaintiff's rights and equities therein." We think these allegations are quite sufficient to let in the proof. Plaintiff was uninformed as to the particular and specific nature of the bank's holding, and proceeded somewhat in the way of a discovery; but, when he shows that the bank took and received the paper with full notice and knowledge of his equities, he has done all that is required to support proof to that purpose.

That the bills were fraudulently procured by Keller from Benson and the Days, and without authority from the packing company, is but little controverted. Keller was the chief factor in procuring the document of December 7, 1894, purporting to have been executed by the Columbia Packing Co., and his real purpose seems not to have been disclosed to any other stockholder or director

of the company. An inherent infirmity in the document
is that it never became the contract or agreement of the
company, by reason of the fact that it was never author-
ized or properly executed by that concern. At the date
of its purported signing, A. A. Bonney was the president
of the company, George Keller secretary, and Ed. Phir-
man treasurer, and these three were its only stockholders
and directors. After reading the agreement, Bonney flatly
refused to have anything to do with the meeting, or to
consent, as a director, to the terms and conditions thereof ;
assigning as a very sufficient reason that it was not fair
to the creditors of the company to thus impair the capital
invested. Failing to get Bonney's assent to hold the
meeting, Keller applied to Rice, who then held Bonney's
stock in pledge, but he likewise refused to participate
therein. Resort was then had to the expedient of ap-
pointing Guthrie, president *pro tem.*, who was not the
owner of any stock in the concern, had never been elected
a director, and was entirely and absolutely unauthorized
to act in such a capacity. The appointment was made
by Keller alone ; for Phirman, as it appears to us from
the weight of the evidence, did not participate in the
meeting. Thereupon these two (Guthrie and Keller)
went through the form of adopting and executing the
contract as and for the act and deed of the corporation,—
Guthrie signing it as president ; and Keller, without des-
ignating his official capacity or attaching the corporate
seal, which was, however, subsequently attached. What-
ever general authority Keller may have had to execute
contracts as an officer of the corporation (and he had ab-
solutely none in this instance, as shown by the records),
Guthrie was without color or semblance of authority to
participate in the meeting, or to sign as president *pro
tem.* If it should be conceded that he was a stockholder,

he had never been chosen or elected a director, and he could not lawfully participate in a directors' meeting,— much less, act as president of the board.

Beyond this feature of the controversy, the contract itself does not purport to transfer or set apart from the whole to Keller any definite or certain accounts. The stipulation is that it will transfer of the remainder of the accounts, to wit, $11,657.42,—one-third, to wit, $3,885, to said George Keller. There was no segregation of the one-third, or setting the same apart to Keller; so that the contract, supposing it to have validity, constituted only an agreement to transfer a one-third interest, not that such interest had been segregated from the whole and transferred. Nor does the agreement authorize Keller to collect either upon his individual account, or on behalf of the company. Mr. Keller must therefore look elsewhere for his authority to collect from Benson and pay himself. His duties in connection with the business of the company furnished no warrant for his action. Bonney and Phirman were the business managers,— more, however, by common consent than by any direct authority to that purpose. They did the collecting and handling of the funds, drew checks against them, and transacted all matters of business incidental to the purposes for which the corporation was maintained. Keller was never permitted to draw any checks on account of the company; nor did he ever collect any of its accounts prior to the time he assumed to collect from Benson, except on one occasion, and that was to collect some local bills when sent out for the purpose by Phirman. Keller claimed, however, that Phirman gave him permission to collect from Benson, and to apply the funds collected upon his one-third interest in the accounts. He relates that he talked with Phirman respecting the company's accepting J. G. & I. N. Day's checks in payment of the

Benson account; that Phirman said the company did not care to assume the risk, but that if he (Keller) would take them, give credit for them, and assume the risk of their payment, it would be satisfactory to him and the company. But as to this Phirman positively contradicts Keller, and says that he never gave his permission to Keller to make the exchange, nor did he ever suffer or permit Keller to collect for the company but·on the one occasion above referred to. This statement of Keller's is also inconsistent with the receipt he gave to Benson at the time he arranged for the duebills. The document is not in evidence, but Mr. Wilson gives its substance; and, among other things, it provides that Keller was to procure credit for Benson on the books of the Columbia Packing Co. for the amount of the exchange of credit, and to furnish a receipt or evidence of such credit before obtaining the paper. These circumstances, and others that might be recited, disprove Keller's assertion that he had Phirman's permission to make the collection by way of an exchange of credit or otherwise. Keller represented to Benson that he had full right and authority from the company to make the exchange of credit in the manner in which he attempted to secure it, going so far as to show him the spurious contract with the company of December 7; and Benson, relying upon these representations and the assurances that Keller would procure him credit upon the books of the company for the amount of the duebills, and his release from liability to that extent, made the exchange, neither of which did he attempt to have done.

It is further insisted that, immediately after Keller had secured the duebills, he brought them to the attention of the company, and that it ratified his acts. He says he showed the checks to Phirman on the evening he obtained them; that Phirman was satisfied with what

he had done, and placed them in the company's safe over night; that he subsequently related to Rice what he had done, and that Rice approved of the transaction; and that no objections were made by the directors to the exchange of credit until a much later period. This constitutes the basis for the alleged ratification. But the better evidence is against Mr. Keller again. Phirman and Rice both contradict him, and both say that they never saw or heard of the checks until notified of the fact of their issuance by Benson at a much later date; that they immediately denied the authority of Keller in the premises; and that the company never allowed Benson credit for the amount of the paper issued to Keller, although a settlement has been had between them. It cannot be said that Keller was authorized in any relation to procure the issuance of these duebills to himself, and thereby to withdraw from the company the equivalent of its assets. When the whole record is considered, this is very clear; but, owing to the large amount of testimony upon the subject, we are unable to give it more than cursory allusion. Being without right or authority to thus acquire the bills, the result is a palpable fraud upon the company, and they are clearly void in the hands of all holders thereof with notice of their infirmity.

4. The Dalles National Bank procured the series which it now holds some time before January 15, 1895,—the date upon which they fell due. Keller states that the transfer was made some time after the tenth, but before their maturity. The cashier of the bank does not fix the date definitely, but is sure that it was before maturity. The bank took them as collateral for future advances to be made from time to time as Keller might need the money. They were delivered to the bank by Keller, received by it, placed in an envelope, and deposited in its vault, with-

out giving Keller at the time any receipt therefor, or credit upon his account. From the stubs of checks it appears that Keller had been drawing against the bank since January 4, but at the date of the delivery of the bills to the bank it does not appear that Keller was in its debt in any sum. From the account introduced in evidence by the bank, it appears that on January 26 Keller deposited $500 ; on the twenth-eighth, $225 more ; and upon February 14 he had drawn against his credit to the amount of $404.30, leaving a balance in his favor on the latter date of $321.30. On February 16 he drew for $89.50, and on the twentieth for $75 additional. On January 19 the bank, by one of its officials, wrote J. G. & I. N. Day of its holdings ; and on the twenty-first they notified it that Mr. J. G. Day would be in The Dalles in a few days, and would call upon it,—saying that their pay day had been unavoidably delayed. On February 11 they again wrote the bank, in answer to an inquiry : ''We have been requested by the party in whose interest the drafts were drawn to withhold payment for a few days, pending the settlement of a dispute that has arisen between the parties. We will take the matter up to-morrow and write you further.'' No other letter appears to have been received by them, however. On February 14 Benson went to The Dalles, and, after learning that the company would not credit him with the amount of the duebills, employed counsel to secure an adjustment. On the same day one of the counsel made a demand upon Keller for a return of the bills, tendering him the receipt which he had given to Benson. He having refused, counsel, either on the next day or two days thereafter, made inquiry of the bank, and ascertained that it held some of the paper, whereupon he told the cashier that the duebills had been obtained from J. G. & I. N. Day, or from Benson through J. G. & I. N. Day, by fraudulent representations, and

that proceedings would be instituted at once to secure their return and cancellation. This suit was instituted and the bank served with summons April 5 following. In the meantime, inclusive of the fifth, Keller had by overdrafts become indebted to the bank in the sum of $746.98, and upon that day gave his note thereto for $1,000, and obtained credit for that sum upon his account. Keller's account was subsequently continued, he depositing and drawing as occasion demanded. On February 1, 1896, he executed another note to the bank for $500, and obtained a like credit upon its books; but he had drawn against it and the former note to their full limit, and the bank now claims to hold the Day checks or duebills as collateral for the payment of the said two notes.

The plaintiff protests that the bank is not, under the conditions attending the transaction, a purchaser thereof for value. The letters from J. G. & I. N. Day written to it, and the notification by plaintiff's counsel that the duebills had been obtained through fraudulent representations, and that suit would be instituted to recover them, were undeniably sufficient to give the bank notice of the infirmity attending them; and more especially is this so as they were at the time overdue and unpaid. The letter was written only a few days prior to the date when counsel advised the bank, on the part of the plaintiff, that the duebills had been fraudulently issued; and at that time Keller was not a debtor, but a creditor, of the bank, and they were not then held as collateral for any sum whatever. Any amounts advanced upon the credit of this paper were subsequently made. The bank is not, therefore, in the position of an innocent holder for value. True, the transfer and arrangement with Keller whereby he was to have advances upon the paper were made before maturity; but no such advances were made until after the

bank had been apprised of the infirmity, and the paper was long overdue. In *Dresser* v. *Missouri, etc. Const. Co.* 93 U. S. 92, an action was brought upon several promissory notes, to which the defense was interposed that they had been fraudulently procured. The plaintiff claims to have purchased the notes upon a verbal agreement that the money should be paid therefor as it should be required, but he gave no note or other obligation which might have, by its transfer, subjected him to liability. Five hundred dollars was paid before the notice of the fraud was brought home to him, and the balance agreed upon subsequently. The lower court instructed the jury "that if the fact of fraud be established, and the jury find from the evidence that the plaintiff paid $500 upon the notes without notice of the fraud, and that after receiving notice of the fraud he paid the balance due upon the notes, he is protected only *pro tanto*; that is, to the amount paid before he received notice." This instruction was approved by the supreme court on appeal; the court, speaking through Mr. Justice HUNT, saying : "The notes in question were purchased upon an unexecuted contract, upon which $500 only had been paid when notice of the fraud, and a prohibition to pay, was received by the purchaser. The residue of the contract on the part of the purchaser is unperformed, and honesty and fair dealing require that he should not perform it; certainly, that he should not be permitted, by performing it, to obtain from the defendants money which they ought not to pay. As to what he pays after notice, he is not a purchaser in good faith. He then pays with knowledge of the fraud, to which he becomes a consenting party. One who pays with knowledge of a fraud is in no better position than if he had not paid at all. He has no greater equity, and receives no greater protection. Such is the rule as to contracts generally. * * * Upon receiving

notice of the fraud, his duty was to refuse further pay-
ment, and the facts before us require such refusal by
him.''

The case at bar is even stronger, as that was a purchase,
and the contract executory. This is not a purchase, but a
pledge of collateral to secure future advances. Whenever
it became known that the paper had been fraudulently ob-
tained, then the bank was under no further legal obliga-
tion, as between it and Keller, to make advances upon its
credit. The bank negotiated with the idea that Keller was
pledging good paper, and it was only required to make or
continue advances upon the very quality of security for
which it had contracted. But as soon as it was made
aware of the fact that the paper was not such as it had
stipulated for, but had been obtained through fraud and
deceit, at that moment it was released of its obligation to
Keller, and was not bound, under its agreement with him,
to make or continue the advances. Being thereby released
of its obligations to Keller, advances subsequent to the
notice were at its peril ; and, the infirmity being estab-
lished, its position entitles it to no greater protection than
those who were parties to the original transaction : *Texas
Banking & Ins. Co.* v. *Turnley*, 61 Tex. 365, is a case of
some analogy to the present. The husband pledged cer-
tain railroad bonds, the property of his wife, as security
for such sums as he might then or thereafter owe the bank.
The action was to recover the value of the bonds, upon the
ground that they were hypothecated without the authority
of the wife. It was not shown that the bank had notice
of the infirmity of the husband's title at the time the bonds
were received as collateral, but, because it did not appear
that the bank had advanced any money upon the faith of
the bonds prior to their maturity, it was held that the bank
was not a *bona fide* holder, and was therefore liable to ac-
count for their value ; thus promulgating the principle

that, where negotiable securities are taken as collateral for future advances, and none are made until after the securities have matured, as to such advances the holder cannot maintain that he is a purchaser for value, without notice of infirmity. We are not called upon to go as far as that, but the case is cited as illustrative and in re-enforcement of the principle which governs here. We hold that, where negotiable paper is taken before due, as collateral for future advances, but none are made until after its maturity, the holder having notice in the meanwhile of its infirmity, such holder does not occupy the position of a purchaser for value, and will not be protected as against the party defrauded.

5. It is urged that, as Mr. Benson was not a party to the paper, whatever notice he may have imparted to the bank did not bind it, and that it was not required to give credence to the representations and demands of a mere stranger. But the bank had prior notice from the makers of the duebills that all was not right; and the positive statement of Benson's counsel that they had been obtained through fraudulent representations, and that suit would be instituted at once to recover them, was sufficient to signify to the bank that he spoke with a degree of authority, requiring inquiry and investigation. It is also suggested that suit was not brought at once, but was delayed for nearly two months. But this did not change the condition that the bank was dealing with overdue paper, having an infirmity, with notice of such infirmity. These considerations affirm the decree of the court below, and it is so ordered.        AFFIRMED.