Submitted on briefs June 11; reversed July 28, 1931

# BANK OF FREEWATER v. HYETT ET AL.

(1 P. (2d) 1113)

*T. B. Handley* and *F. S. Sever,* both of Portland, for appellants.

*Custer E. Ross,* of Salem, for respondents.

BEAN, C. J. It appears from the testimony that the notice of sale mentioned in defendants' cross-complaint was never made effective. It was intended as a sale in connection with the $2,400 note, but by mistake was described as the $1,500 note. It has no further bearing in this case.

It is conceded that the $360 note was altered as to its date and is invalid. It appears that Hyett was employed as cashier of the bank after the option to purchase two hundred fifty shares of stock of the bank had been exercised. All of the two hundred fifty shares of stock purchased by Hyett for Hattrem remained in Hyett's name and were voted by him until two hundred twenty shares thereof were transferred to Hattrem. After that Hyett voted the thirty shares of stock in his own name. Hyett states that he retained thirty shares of stock to qualify himself as cashier and director of the bank. However, as shown by his own testimony, it required only five shares of stock to so qualify.

It appears from the testimony that, at the time the option to purchase the stock of the bank was obtained, the Bank of Freewater was in financial difficulties, its reserves being depleted, and that new capital was necessary for its continued operation; that in order to pay the then owners of the stock and provide the necessary capital of the bank, an arrangement was reached by which a corporation, known as Freewater Investment Company, was organized and stock in that company issued to the owners of the stock of the Bank of Freewater, which was covered by the option; that approximately $25,000 of the doubtful assets of the Bank of Freewater were then transferred to the Freewater Investment Company to pay for its stock. In order to replace these assets in the Bank of Freewater,

$22,000 in cash and securities were furnished by W. A. Hattrem and placed in the bank, and the $3,000 note of defendants and the two hundred fifty shares of stock of the Bank of Freewater were transferred to Hyett. It is also in evidence that W. A. Hattrem was never at any time an officer or director of the bank and that he did not appear as a stockholder of record in the bank until April 26, 1928, when the two hundred twenty shares of stock held by Hyett were transferred on the books to Hattrem.

■ The testimony in the case does not substantiate the allegations of the further and separate answer or cross-complaint of defendants Hyett. It is indicated by Hyett's own testimony that at the time an arrangement was made between him and Hattrem, who, it should be borne in mind, was not an officer of the bank, it was understood that Hyett should be cashier of the bank at a salary of $200 per month, and this was certainly a consideration for the $3,000 note. Not only that, it was also in contemplation that a chain of banks would be established and that Hyett would be employed at a much larger salary. The matter at that time, no doubt, had a very rosy hue. Crowe testified that Hyett named a price of $125 per share for the stock of the bank, about June, 1928, at the time of the execution of the $2,400 note. Hyett testified, in effect, that when he left the bank the thirty shares of stock were in the bank. That is literally correct, but the thirty shares of stock were in the personal charge of one of the directors, Mr. Bean, for some time. When the $2,400 note was given, according to Crowe's testimony, Hyett endorsed the certificate of stock and Crowe took the stock to the bank and gave it to Mr. Harris, the president of the bank, in connection with the $2,400 note.

Hyett's allegations in his cross-complaint and testimony, in regard to the note being given for no consideration and that the bank agreed that it should not be paid, are simply conclusions which he makes as an afterthought. The actual facts which he delineates are not in accord therewith.

Hattrem and Hyett did not purchase all of the stock of the bank, but fifty shares were owned by other stockholders. Hyett testified on cross-examination that he was elected cashier in January, 1927, and director sometime in June of that year, and continued as cashier and director until May, 1928. He then testified as follows:

"Q. How did you come to say thirty shares was to be left in your name?

"A. Well, Mr. Hattrem wanted me to buy some stock, and as I had stated previously, I had no money to buy stock with, and he told me to put my note in for $3,000 and leave the stock there with Mr. Bean, which was done."

He states in regard to the $3,000 note that "the bank told me they would take care of it." He does not say that any of the officers of the bank ever made that statement. It is apparent that it was expected, by putting the bank upon a fair financial basis, the expenditure for the stock could be realized from the profits or sale of the bank. As security for the note, the thirty shares of stock were turned over to one of the officers of the bank, who kept it in his personal box. When it appeared that the bank was verging upon the rocks for the second time, Hyett endeavored to so arrange matters as to defeat the payment of the note, and took the $3,000 note, signed by himself and wife, out of the bank and replaced the same by his individual note. Upon this being discovered, and

he being informed by the superintendent of banks that such a proceeding was a violation of the law, he obtained the signature of his wife to the note. Upon being asked, ''Then how does it come your wife signed this note,'' he testified: ''Well, the bank thought—me not having any property in my name, by the wife signing the note, possibly it would be a little better.'' Upon being interrogated as to whether he made any objections to getting his wife's signature on the note, he stated that he made objection at the time to Mr. Hattrem, but never discussed the matter with any of the officers of the Bank of Freewater. Why should he object to his wife signing the note if it was a mere matter of form and was not then intended to be an effective note?

There is nothing in the record to indicate that at the time Hyett gave the $3,000 note and obtained the signature of his wife thereon but what he was perfectly free to purchase the stock and act as the cashier of the bank or refrain from so doing. Evidently Hattrem, who was not a witness in the case, thought that by Hyett taking a small amount of the stock it would increase his interest in the bank, and they were, in effect, joint adventurers in the purchase of the stock. The testimony shows that at several times those interested in the bank had importuned Hyett to pay the $3,000 note and that he never questioned the efficacy of the note but made excuses for nonpayment, indicating that at a certain time he would obtain some money from the rent of a hop ranch.

About October, 1928, the bank again was in bad financial condition, and unless new capital was provided the bank would be closed by the state superintendent of banks. It was necessary for new capital to be procured, amounting to approximately eighty per

cent of the issued stock. This was after Hyett had severed his connection with the bank. T. A. Crowe, who was the agent of W. A. Hattrem at that time, visited Freewater and an arrangement was made by which the stockholders, who were available, were to contribute new capital to the bank on the basis of eighty per cent of their stock holdings. Hattrem contributed some $19,000 in cash and securities, and other stockholders made contributions. Crowe visited Hyett, who was then in the country, and secured a note for $2,400, covering the eighty per cent on the thirty shares of stock in his name, the note being taken in the name of the Bank of Freewater. In order to provide for the reimbursement of the stockholders owning two hundred fifty-one and one-half shares of the capital stock of the bank, including the thirty shares held by Hyett, certain paper of the bank was turned over to Crowe and Harris, as trustees, to liquidate, and upon collection to distribute the proceeds among the stockholders in the proportion that their stock holdings bore to the total of two hundred fifty-one and one-half shares. Among this paper was included the $2,400 note of defendant Hyett. The testimony shows that the $2,400 note executed by Hyett, for an assessment upon his thirty shares of stock, which assessment was undoubtedly required by the superintendent of banks, although the assessment appears to have been an estimate made by the interested people, stands upon the same footing as the $3,000 note.

We have then in this transaction the execution of the note by Hyett; the obtaining of security thereon by the signature of his wife; the placing of the stock which he purchased in the hands of a third person, namely, Mr. Bean, a director of the bank, as available security for Hyett's liability; the execution of the

$2,400 note in lieu of paying an assessment on the stock of eighty per cent, and the services of Hyett as cashier in the bank for a considerable length of time at a salary of $200 per month and giving him experience as a banker, with an expectation of promotion.

It should be noticed that at a time when he was a sworn officer of the bank, if his claim now made is a valid one, he was palming off to the superintendent of banks a note of $3,000 as a valid asset of the bank in fraud of the stockholders and depositors of the bank and in violation of the laws of the state. We opine that Hyett ought not to take advantage of his own wrong.

It appears to be the theory of Hyett that by reason of Hattrem owning two hundred twenty shares of the capital stock of the bank, he owned and was the bank. This, however, he should have understood was not the fact.

The records of the bank show that a regular application for a loan for $3,000 was made by Hyett, for which the $3,000 note was given. On May 21, 1928, the superintendent of banks wrote a letter to Hyett, part of which, after mentioning the $360 note, reads as follows:

"Regardless of what may have been your understanding with Mr. Harris or any one else it is contrary to the law for any one to borrow from the bank and not pay interest. If you had some understanding with Mr. Hattrem a refund should be made to you, but out of fairness to all the stockholders the interest must be paid to the bank. Nonpayment of interest is interpreted to be a false statement or false entry on the books and as a banker you know this is a penitentiary offense.

"I was very much surprised to read Examiner Carlson's report and find that you had taken out a note signed by yourself and your wife and substituted

a note signed by yourself personally and the further fact that this was done without having the renewal approved by the board. Again this is defined as a felony and that was my reason for calling you by 'phone so as to give you an opportunity to have your wife sign the note before written demand was made by this department. Mr. Harris states in his letter that Mrs. Hyett will sign on the condition of a renewal at the date of maturity.

"The renewal question is not up to this department. Our request is that Mrs. Hyett sign the note and that she do so on receipt of this letter and without any further delay, otherwise we will report this matter to the district attorney. This may seem a small matter to you but in our supervision program this is a serious offense."

On May 25, 1928, Mr. J. W. Hyett wrote to the superintendent of banks at Salem, Oregon, the following letter:

"Replying to yours of the 21st inst. wish to say that Mrs. Hyett has signed the note as requested.

"There is a signed application and approved by the board of directors on file in the bank for loans during the year 1928 not to exceed $4,000, I enclose herewith a copy of the application.

"I have written Mr. Hattrem regarding the stock, and you will find a copy of the letter enclosed.

"It is a hard matter to borrow money at this season of the year, I will see what I can do in regards to borrowing money to pay the loan, as I am anxious to clean up this matter as soon as possible.

"Mr. Harris holds the stock that I have in the Umapine Cheese factory as collateral.

"I regret very much that this transaction has been the cause of so much annoyance, I realize your position, I want to assure you that it was far from me, to do anything irregular or contrary to law."

██ Hyett claims that the note was signed as an accommodation to the Bank of Freewater. How was the

bank accommodated in any way? The capital of the bank is its life, its foundation for doing business, and one subscribing for shares of stock in a bank ordinarily should pay for the shares in cash. Sometimes a stockholder is required to pay more than that. Hyett was required, in order to carry out his undertaking, to pay an additional eighty per cent, but not having the money he gave another note therefor in the sum of $2,400. An accommodation party is one who has signed the instrument as maker, acceptor or indorser without receiving value therefor, and for the purpose of lending his name to some other person, and is primarily liable thereon: Section 57-206, Oregon Code 1930. Hyett received value for signing the note according to his own statement. What good ground is there for believing that Hyett signed the note for the purpose of lending his name to the bank or Hattrem or any one else? He had no property, apparently, in his own name. One of the things he was seeking was a position in the bank so he could obtain a salary. The allegation that he was an accommodation party is a mere conclusion not substantiated by the facts.

■ The Hyetts allege no fraud or illegality in the execution of the note; therefore, it is not competent for them to allege or prove a contemporaneous parol agreement to the effect that they would not be called upon to pay the notes and thereby vary and alter the effect of a written instrument. This would be the rule, even if we assumed that Hyett was an accommodation party: *Farmers' State Bank v. Forsstrom*, 89 Or. 97, 102 (173 P. 935); *Portland National Bank v. Scott*, 20 Or. 421 (26 P. 276); *Western Carolina Bank v. Moore*, 138 N. C. 529 (51 S. E. 79); *Bank of California v. Starrett*, 110 Wash. 231 (188 P. 410, 9 A. L. R. 177).

*Western Carolina Bank v. Moore,* supra, is very much like the case at bar. In its opinion the court said:

"The court is unable to perceive anything in the allegations or testimony which shows or tends to show a valid defense to this demand. It appears from the answer and the evidence that the defendant executed the note sued on to his father-in-law, J. E. Reed, for his stock in the bank and received the consideration. By virtue of his agreement and the note the defendant became a stockholder in the bank, qualified and served as a director, taking part in the bank's management and receiving pay for his services. During that time, this note was reported as part of the assets of the bank and the jury have decided that same belonged to the bank. The only defense attempted amounts in substance to this: That though the defendant executed his note and received a valuable consideration for same, there was an understanding and agreement at the time that payment should never be enforced or demanded. All the authorities are agreed that such a defense is not open to the defendant."

Hyett, by his suggestion that Hattrem owned the bank and was the bank, ignores the right of local stockholders in the city of Freewater and its vicinity, who owned fifty shares of the stock of the bank. Their rights are just as sacred as though the amounts were larger.

The records of the bank stock book show that on June 9, 1928, W. A. Hattrem transferred all his certificates of shares to A. A. Dumphy.

The directors and officers of the bank, in making the assessment of eighty per cent made it practically pursuant to agreement and not in the regular way. They were compelled, however, if they did business in the bank, to strengthen the financial condition of the bank.

Hyett complains in a general way of the representations of Crowe at the time he obtained the $2,400 note from Hyett. The plan then was to rehabilitate the bank, and it seems to us clear that what Crowe indicated was that by the sale of the bank Hyett's note would be taken care of, but it was in no way indicated that the $2,400 note, as well as the $3,000 note, should not be a valid note and be paid in some manner. This conclusion is reinforced by the fact that Hyett gave a $1,000 note in connection with the Freewater Investment Company and upon the liquidation of that concern Hyett's note for $1,000 was paid. Unfortunately, the business of the Bank of Freewater was not as prosperous as it was expected that it would be, something like other banks during those times. But this does not release Hyett from his liability upon the notes. Neither the $3,000 note nor the $2,400 note should be cancelled, according to the testimony in the case. The equities are not with the Hyetts.

■ We agree with the learned counsel for defendants Hyett that equity has jurisdiction to cancel void instruments: *Benson v. Keller,* 37 Or. 120, 129 (60 P. 918), and other Oregon cases.

■ We do not criticize the proposition of law advocated by counsel for defendants to the effect that, as between the original parties "it is proper to show that a bill or note, absolute in form, although manually delivered to the payee, was not to become a binding obligation except upon the happening of a certain event." Citing *La Grande National Bank v. Blum,* 26 Or. 49, 51 (37 P. 48); *Colvin v. Goff,* 82 Or. 314, 325 (161 P. 568, L. R. A. 1917C 300); *Vincent v. Russell,* 101 Or. 672, 677 (201 P. 433), and other authorities. But we can not find from the testimony that the $3,000 note was not to become a binding obligation, except upon the

failure of Hyett to deliver the bank stock to the bank. Such an arrangement or agreement is not shown by the testimony.

Equity having assumed jurisdiction of the case, it should fully determine the matter in regard to the $3,000 note. The decree of the circuit court is reversed and a judgment will be rendered in favor of plaintiff and against the defendants J. W. Hyett and J. W. Hyett, as administrator of the estate of Sylvia Smith Hyett, deceased, for the sum of $3,000, together with interest thereon, at the rate of eight per cent per annum from April 10, 1928, and for the further sum of $300 as attorneys' fees, and for costs and disbursements herein.