TEXAS BANKING & INS. CO. V. JAMES B. TURNLEY ET AL.

(Case No. 1783.)

1. TRANSFER OF NEGOTIABLE INSTRUMENTS.— However wrongful may be the act of a person by whom a negotiable instrument is passed to an innocent purchaser, such purchaser is protected, though the transfer to him may have been without legal authority. In such case one who takes under well recognized conditions, from one who has the apparent power to convey, is as fully protected in his right to the paper as if he held under the real owner.

2. SAME.— When the purchaser or holder of a negotiable instrument has obtained it in good faith, and for a valuable consideration, in the ordinary course of business before its maturity, and with no notice of its dishonor, or of any other fact that could affect its validity as between antecedent parties, the fact that it had no validity as to such antecedent parties will not affect his right to recover on it; he may then recover against its maker, though it was obtained by him from whom the holder thus purchased it, without consideration, or by fraud, theft, or robbery.

3. SAME.— The possession of a negotiable instrument payable to bearer indorsed in blank, or specially indorsed to the holder, carries title with it to the holder; and one who takes such securities under like circumstances, as a collateral security for present or future advances, is entitled to the same protection. Citing Murray v. Lardner, 2 Wall., 110; Goodman v. Simonds, 20 How., 365, and other cases.

4. COLLATERAL SECURITY — NEGOTIABLE INSTRUMENTS.— Title to a coupon railway bond of the state of Georgia, which really belonged to the wife, passed when delivered by the husband as collateral security for a debt due by him and future advances, when the delivery was bona fide, in the ordinary course of business, and with no notice of the wife's interest.

5. SAME.— If, however, the bond was transferred and delivered as a collateral security for future advances, and no advances were made until after the maturity of the bond, then the title of the holder would depend on the real ownership of the bond at the time the advances thus made after its maturity were received, and in such a case the rights of the wife as the true owner would be protected. Following Foley v. Smith, 6 Wall., 493; Texas v. White, 7 Wall., 735, and many other cases cited.

6. SAME.— He to whom negotiable paper is transferred, after it is due, acquires. nothing but the actual right and title of the party who transfers it.

ON MOTION FOR REHEARING.

7. DISTINGUISHED.— This case distinguished from The National Bank v. Boyd, 44 Md., 48, which is reviewed and discussed. Also distinguished from The Merchants' National Bank v. Hall, 18 Hun (Sup. Ct. N. Y.), 176; and from Atwood v. Crowdie, 1 Starkie, 484.

APPEAL from Galveston. Tried below before the Hon. Wm. H. Stewart.

Suit by James B. Turnley to recover from the defendant the value of a certain bond of the Georgia Railroad Co., payable on 1st July, 1874, of the denomination of $500, with two interest coupons thereto attached, each for $17.50, alleged to have been deposited with the defendant, and which the defendant had wrongfully converted to its own use. By amended petition, James B. Turnley alleged that the bond and coupons were the separate property of his wife, Louisa A. Turnley. That the defendant received them from him by virtue of his order in writing on Norton, Slaughter & Co., who then held them, and the defendant promised to hold and collect them for his account, and to account and pay over to him the proceeds thereof when collected; that the defendant had failed to pay the proceeds thereof to him, or to deliver to him the bond and coupons or to account to him therefor, but had converted them to its own use.

Louisa A. Turnley intervened by petition, alleging that she was the wife of James B. Turnley and the owner of the bond and coupons in her separate right; that this suit was brought by her husband in his own name, under the impression that the separate property of a married woman was under the control of the husband, including the power and right to sue therefor in his own name, and that it had only been within a few days that she was advised to the contrary, and of the legal necessity to join in the suit with the plaintiff or to intervene in her own behalf for her separate estate. She alleged that on the 22d day of December, 1873, and before and since her intermarriage with the plaintiff, she was and continued to be the owner of said bond and coupons as her individual and separate property, and "adopts all the allegations in the plaintiff's petition and amendments, substituting her name for his, and the matters and things therein alleged, as having been done by him for this intervenor, and as thus stated she repeats the averments and allegations as against said defendant contained in said petition and amendment,

with the exception as to the ownership of the bond and coupons;" and prayed judgment therefor of the value before stated.

The defendant denied all the allegations of the plaintiff, James B. Turnley, and those of the intervenor, Mrs. Turnley, and alleged that the order on Norton, Slaughter & Co. was given to the defendant with the distinct understanding that the defendant was to hold the bond and coupons in suit as collateral security for any debt then due or that might thereafter become due from the plaintiff to the defendant.

Other facts appear from the opinion. It was not shown that any advances were made by the bank until after the maturity of the bond. Verdict and judgment for Mrs. Turnley.

*C. L. Cleveland*, for appellant, cited: Huyler *v.* Dahoney, 48 Tex., 239–40; Jerome *v.* McCarter, 4 Otto, 734; Yeatman *v.* Savings Institution, 5 Otto, 766; Byles on Bills, 166, 171; Atwood *v.* Crousie, 1 Starkie, 483; Dos Pasos, 131; Byles on Bills, 176–7; 2 Dan. on Neg. Inst., 437, 1503, 1506; 2 Wall., 110; 12 Otto, 444; Story on Prom. Notes, sec. 124; G., C. & St. F. R'y *v.* Levy, 59 Tex., 542; McCauley *v.* Long, decided at Galveston, 1884 (*ante,* 74); Rose *v.* Houston, 11 Tex., 327; Craig *v.* City of Vicksburg, 31 Miss., 216; 33 Miss., 539; 36 id., 67; 5 Tex., 152; 8 Tex., 414.

*George Mason* and *Albert Mills*, for appellee, cited: Const. of 1869, sec. 14, art. 12; McKay *v.* Treadwell, 8 Tex., 180; Cartwright *v.* Hollis, 5 Tex., 164; Pasch. Dig., art. 4641; Read *v.* Allen, 56 Tex., 193; Edrington *v.* Mayfield, 5 Tex., 365–68; Gamble *v.* Dabney, 20 Tex., 69; Dodd *v.* Arnold, 28 Tex., 97; Weathered *v.* Smith, 9 Tex., 625; Chitty on Bills, 157; Texas *v.* White, 7 Wall., 735; Andrews *v.* Pond, 13 Pet., 65; Coddington *v.* Bay, 20 Johns., 637.

STAYTON, ASSOCIATE JUSTICE.— It is not questioned that the bond in controversy was the separate property of Mrs. Turnley, and such it will be considered. This being true, if it was deposited by her husband with the bank for the purpose, and under the agreement claimed by it, which, under the verdict, will be assumed to be true, then the act of the husband was wrongful as to the wife and without legal authority.

It is urged that no title to the bond passed to the bank, and that it had no right to hold it, even in pledge, as a security for any sum which the bank may, under the contract which it asserts was made with Turnley, have advanced to him on the faith of the pledge of the bond, and this for the reason that the statutes of this

state, it is urged, in terms provide the sole mode by which any character of separate property of a married woman may be conveyed, which not having been complied with, no right or title vested in the bank through the unauthorized act of the husband.

It is claimed that the husband had no power to transfer the bond in sale nor to place it in pledge and thus bind the wife; that the wife joined by her husband could do this, only in the mode prescribed by the statute for the conveyance of the separate property of a married woman.

Whether this be true or not in reference to negotiable instruments which pass by delivery, we need not in this cause consider.

There are many reasons why the statutes, applicable to the transfer of other separate property of married women, should have no application to the transfer of such negotiable instruments passing by delivery as they may own, and authorities are to be found holding that as to such instruments statutes similar to those of this state, in reference to the conveyance of the separate property of married women, have no application. Work v. Glaskins, 33 Miss., 539; Cobb v. Duke, 36 Miss., 62; Robertson v. Wilcox, 36 Conn., 429.

The great mass of the business of the commercial world is now transacted through negotiable securities, which embrace many classes of paper other than promissory notes and bills of exchange, among which are coupon bonds when negotiable in form. Daniel on Neg. Inst., 1500, and authorities cited. Such was the character of the bond in controversy, which carried on its face the promise of its maker to pay at a given time to its bearer the sum named in it.

This being true, the power of the husband of Mrs. Turnley rightfully to transfer the bond or place it in pledge becomes of but little, if any, importance, if the bank in legal effect was an innocent purchaser.

The fact that the pledge may have been made by the husband cannot surely make it less effective than if made by a stranger.

The ordinary rule is, that no person can transfer to another greater right in personal property than such person has; but there is a well recognized exception to this rule, a disregard of which would work incalculable injury to the commercial world.

Negotiable securities furnish this exception, and, in reference to them, rules are wisely adopted which are applicable to no other personal property; and however wrongful may be the act of the person by whom such instruments are passed to an innocent purchaser, he is protected under well settled rules, notwithstanding the transferer may have had no legal right to transfer.

In such cases legal right and real power to convey become unimportant; and he who takes, under given and well recognized conditions, from one who has apparent power is as fully protected in his right to such paper as though he held under the real owner.

The principles applicable to the right of a *bona fide* purchaser of negotiable paper, as found in the adjudications of the courts, are thus stated by an elementary writer: " That the purchaser or holder of a negotiable instrument, who has taken it, (1) *bona fide;* (2) for a valuable consideration; (3) in the ordinary course of business; (4) when it was not overdue; (5) without notice of its dishonor; and (6) without notice of facts which impeach its validity as between antecedent parties, has a title unaffected by those facts, and may recover on the instrument, although it may be without any legal validity as between the antecedent parties; as, for example, though it was without consideration originally, or was subsequently released or paid, and even though it was originally obtained by fraud, theft or robbery."

" That the possession of a negotiable instrument payable to bearer, indorsed in blank, or specially indorsed to holder, carries title with it to the holder.   The possession and title are one and inseparable." Daniel on Negotiable Instruments, 769*a;* Murray *v.* Lardner, 2 Wall., 110; Goodman *v.* Simonds, 20 How., 365; Texas *v.* White, 7 Wall., 735; Hotchkiss *v.* Bank, 21 Wall., 359; Greenwell *v.* Haydon, 78 Ky., 332; Coddington *v.* Bay, 20 Johns., 644.

One who takes such securities under like circumstances, as a collateral security for present or future advances, is entitled to the same protection.   Goodman *v.* Simonds, 20 How., 365; Texas *v.* White, 7 Wall., 735; Bank *v.* Hoge, 35 N. Y., 68; Stoddard *v.* Kimball, 6 Cush., 469; Bank *v.* Chapin, 8 Metc., 42; Bank *v.* Fowler, 36 Ohio St., 525; Buchanan *v.* Bank, 78 Ill., 501; Ringling *v.* Kohn, 4 Mo. App., 61; Fisher *v.* Fisher, 98 Mass., 303; Colebrooke on Collateral Securities, secs. 8, 17, 43, 65, 70, 194, and authorities cited under the several sections; Daniel on Neg. Inst., 824–833, and authorities cited in notes.

The bond in question was payable to bearer, and title thereto would pass by its delivery; if taken under such a contract as is alleged by the bank, the taking was *bona fide;* it was in the ordinary course of business, and, so far as the record shows, without notice of any fact which would even throw suspicion on the title of Turnley; and if taken for a valuable consideration paid by the bank, before the maturity of the instrument, or to secure a liability incurred before that time, its right to the paper as a pledge must be held invulnerable, to

the extent necessary to protect the bank for all advances made to Turnley prior to the maturity of the paper.

It is alleged, and there is evidence tending to show, that the bank received the bond with others about the 22d of December, 1873, under an agreement with Turnley that the bank should hold them as collateral security for such sums as Turnley might then or thereafter owe the bank, with which he contemplated a future course of dealing. We consider the case, under the verdict, as if there was an express finding that such an agreement was made at the time the bond was deposited.

If on the faith of such pledge the bank became the creditor of Turnley during any time prior to the maturity of the bond, then the bank would have the right to hold the bond or its proceeds to secure the payment of such sum; but it is not believed that a contract made by Turnley before the maturity of the bond would be a continuing contract, which would give the bank the right so to hold the bond or its proceeds to secure a debt contracted with Turnley after the maturity of the bond, nothing in relation thereto having been done, or liability incurred by the bank, prior to that time.

Such a contract, in legal effect, would be a new contract, founded in consideration on the advance made at the time; and Turnley not being the owner of the bond, the right of the bank must be determined by the state of facts existing at the time the debt due to the bank was created.

While it is well settled that one who, in good faith, takes, before its maturity, a negotiable instrument in pledge as collateral security for present or future advances which he may make, will be protected, notwithstanding the pledgor may have had no real title whatever to the instrument, he, however, having an apparent title which may have been acquired by breach of faith as the agent of the true owner, or by theft, robbery or other wrong, yet it is equally well settled that one who takes such an instrument after its maturity from one having no title or right to transfer, and advances money on the faith of it, takes it subject to every right of the true owner, and acquires only such right as had the person from whom he obtained it. Goodman v. Simonds, 20 Howard, 365; Foley v. Smith, 6 Wall., 493; Texas v. White, 7 Wall., 735; Vermilye & Co. v. Adams Express Co., 21 Wall., 139; Greenwell v. Haydon, 78 Ky., 345; Bird v. Cockrem, 28 La. Ann., 70; Henderson v. Case, 31 La. Ann., 216; Arnets v. Commonwealth, 18 Gratt., 750; Thomas v. Kinsey, 8 Ga., 429; Colebrooke on Collateral Securities, sections 46, 69, 70, and cases cited in notes to the several sections; Daniel on Neg.

Inst., 782; Schouler on Bailments, 174; Weathered *v.* Smith, 9 Tex., 623; Greneaux *v.* Wheeler, 6 Tex., 515; Pasch. Dig., art. 221.

It appears that Turnley did his banking with the appellant after the deposit of the bonds; but the record does not show the state of the account between them at the date of the maturity of the bond or at any time prior thereto.

It therefore does not appear that the bank ever advanced to Turnley any sum whatever prior to the maturity of the bond and on the faith of that as a security.

So far as the record shows, the cash deposits of Turnley may have been sufficient to meet all his drafts drawn prior to the maturity of the bond. If so, no right in the bank to hold the bond as against the true owner ever existed.

No indebtedness of Turnley to the bank is shown except that which arose on the 6th day of July, 1874, when the draft on Heller, with the accompanying bill of lading, to secure the acceptance and payment of the draft, were indorsed by Turnley and delivered to the bank as collateral security for the advance then made. This was after the maturity of the bond in controversy.

This being true, the implied contract which then arose between Turnley and the bank, even if based on the original agreement or understanding, must stand as to its validity and effect on the right of Mrs. Turnley, as though the transaction did in fact, as it did in law, transpire on that day solely.

The sole consideration on which the transaction must stand or fall passed from the bank to Turnley on that day; there was none preceding it to sustain it.

There was no such preceding contract or promise between the bank and Turnley as can constitute a consideration for the implied contract of July 6, 1874, and thus sustain the right of the bank, without resort to the consideration which moved from it to Turnley when it cashed his draft on Heller.

The bank might have declined to cash that draft without breach of any contract shown to have been made with Turnley, and he, prior to receiving the money on it, might have demanded the bond in question without violating any contract he had made, and would have been entitled to receive it.

Turnley could have withdrawn the bond at any time, even prior to its maturity, if not then indebted to the bank, for there is no contract shown which made it obligatory on either party to continue business on the basis of such an agreement as the bank alleges was made.

At any time between the 1st July, 1874, which was the date of the maturity of the bond, and the time on the 6th of the same month when the bank cashed for Turnley the draft on Heller, if Turnley was not otherwise indebted to the bank, the right of his wife to demand and receive the bond, of which she was the owner, was clear; such being true, any right which it may assert longer to hold the bond or its proceeds necessarily grows out of, and is dependent on, a transaction and contract between Turnley and the bank after the maturity of the bond. By such a transaction and contract neither the bond nor its owner can be bound.

The rule of commercial law invoked by the appellant has its existence only for the protection of those who deal in negotiable paper while it is necessary to maintain its integrity as the makers of it contract it shall be, and as the commercial world understand it to be, by giving to apparent title in favor of *bona fide* purchasers and holders the effect of full and complete title. No such necessity exists after the maturity of such paper.

Negotiable paper may circulate after maturity and retains many of its commercial attributes, but he to whom it is transferred after maturity acquires nothing but the actual right and title of the transferer; to such person apparent title is not enough, and want of notice of the right of the true owner, further than in law it is deemed to be given by the fact that the paper is past due, is of no importance. Daniel on Negotiable Instruments, 724a.

The charge of the court, in view of the uncontroverted facts of the case, was not erroneous; for in the absence of some fact which showed that the bank might legally hold the bond or its proceeds, it was not error to inform the jury that Mrs. Turnley was entitled to recover if the bond was her separate property, and this even though under a different state of facts the pledge of the bond would have been binding on the wife.

Under the evidence, to have given the first, third, fourth and fifth instructions asked by the appellant would have been error, for they are all based on the theory that the bank was entitled to the bond or its proceeds, notwithstanding it was the separate property of the wife, if the bank had advanced money to Turnley on the faith of it after its maturity.

The second charge asked by the appellant was correct as a legal proposition, but the matter to which it was directed, as the evidence presents the case, was unimportant, and if given, it could not legally have changed the result favorably to the appellant.

Questions raised in reference to the introduction of evidence and

its subsequent exclusion by the court, in the view taken of the case, become unimportant.

Under the evidence, no other result than that reached could legally have been attained, and the judgment is affirmed.

Affirmed.

[Opinion delivered March 7, 1884.]

### On Motion for Rehearing.

Stayton, Associate Justice.— In the examination of this case, although not cited in the brief of counsel, the cases of The National Bank *v.* Boyd, 44 Md., 48, and The Merchants' National Bank, etc., *v.* Hall, 18 Hun (Sup. Ct. N. Y.), 176, with many other cases, were carefully examined, and there is nothing in either of them in the slightest degree in conflict with the principles announced in this case.

The question involved in the first of these cases was as to the liability of the bank for the value of certain bonds deposited with it by Boyd, as collateral security for a current indebtedness, which was subsequently satisfied in full, after which, the bonds still remaining in the custody of the bank, they were stolen from the bank through its negligence.

It was held that the bank was responsible; that the bailment was not gratuitous. If, however, it had been wholly gratuitous, the same result would have followed, if it appeared that the bailee had not exercised such care as the law exacts of such bailees. The case involved no question similar to that involved in the present.

In the last case named, Mrs. Hall, who was the owner of the certificate of stock, pledged it to the bank as a collateral security; " as security for the payment of any demands the Merchants' National Bank may, from time to time, have or hold against Edwin W. Hall," who was her husband.

The pledge was made by the owner, and its validity was in no way questioned; and the sole question in the case was as to whether the pledge would cover debts contracted with the bank by the husband prior to the pledge, as well as those contracted afterwards. The court held that it was a valid and subsisting security for both classes of debts, and no question arose similar to the one involved in this case.

In the case before us, no pledge valid, except by force of a rule applicable to negotiable paper alone, was ever made. It was in fraud of the right of the wife, who was the real owner, and it could only be protected when, under the rules of the law merchant, the

appellant showed itself, as against the true owner, entitled to protection. It made no such case by pleading and proof, the bond being the separate property of Mrs. Turnley.

The rules laid down in the other cases cited in favor of the motion for rehearing are all cases in which collateral securities had been given by the *owner* of them, with view to a future course of credit based thereon, and in such cases it is held that so long as they remain in the hands of the pledgee, if, on the faith of them, advances are made, they will be bound, as will be their owner. The case of Atwood *v.* Crowdie, 1 Starkie, 484, goes to the point involved in this case, *i. e.*, that the lien was divested when the pledgor owed no debt to the pledgee, and that upon the accruing of fresh indebtedness a lien on the paper *deposited by the owner* would revest in accordance with the agreement and understanding of the parties, even though such fresh indebtedness accrued after the maturity of the paper held as a collateral. But there is no question as to what would have been the right of a person situated as was Mrs. Turnley in the case.

We know of no case in which a judgment has been reversed and the cause remanded for the sole purpose of enabling the appellant to state and prove on another trial a case which had not been stated and proved on a former trial. This case comes up after a trial before a jury, the record containing a statement of the facts proved.

We cannot know upon what theory of the law applicable to the case the judge on the trial of the cause gave the charge complained of, nor is it necessary that we should know; it is enough that, on the pleadings and proof, no injury could have resulted to the appellant from the charge given.

The motion for rehearing is overruled.

OVERRULED.

[Opinion delivered March 25, 1884.]