**FIRST NAT. BANK OF EL PASO v. KERR.**
(No. 1138.)

(Court of Civil Appeals of Texas. El Paso. Nov. 26, 1920. Rehearing Denied Dec. 16, 1920.)

**1. Corporations ⚖123(11)—A pledgee, having notice of rights of true owner of stock, can acquire no better title than apparent owner can transfer.**

When one dealing as pledgee with an apparent owner of corporate stock has notice of rights of true owner, he can acquire no better title to the stock than the apparent owner can transfer.

**2. Appeal and error ⚖930(3)—Questions not covered by special issues presumed to have been found by court in favor of judgment.**

In cases tried before a jury, questions not submitted to the jury will be presumed to have been found by the court in favor of the judgment, if there is any evidence to support such conclusion.

**3. Corporations ⚖123(17) — Evidence sufficient to support finding that bank was put on notice as to ownership of stock.**

In an action against a bank for conversion of corporate stock pledged, evidence *held* sufficient to sustain a finding that the bank had notice that plaintiff was the true owner of the stock, which was pledged as collateral by another.

**4. Corporations ⚖123(22)—Pledgee of stock delivering it to improper person guilty of conversion.**

Where bank on payment of note delivered corporate stock held as collateral to the person who placed the stock with the bank, when it knew that the stock should be delivered to another, who was the true owner of the stock, it was guilty of conversion.

**5. Banks and banking ⚖116(1)—Notice to cashier notice to bank.**

Notice to· a cashier of a bank is notice to the bank.

**6. Banks and banking ⚖116(1)—Notice to officer having general supervision notice to bank.**

Notice to a bank officer or one having for the bank general supervision of the business embracing a certain transaction was notice to the bank.

**7. Corporations ⚖123(17)—Measure of damages for conversion of corporate stock stated.**

In an action against a bank for damages for conversion of corporate stock placed as collateral to a note, the measure of damages was the value of the stock at the time converted, less·the amount of the note.

Walthall, J., dissenting.

Appeal from District Court, El Paso County; Ballard Coldwell, Judge.

Suit by A. F. Kerr against the First National Bank· of El Paso, Tex. Judgment for plaintiff, and defendant appeals. Affirmed.

Turney, Burges, Culwell, Holliday & Pollard and C. L. Galloway, all of El Paso, for appellant.

Lea, McGrady, Thomason & Edwards, of El Paso, for appellee.

HARPER, C. J. This suit was brought by appellee, A. F. Kerr, against the First National Bank of El Paso, Tex., to recover damages for the conversion of certain shares of mining stock. The litigation grew out of the following facts:

Plaintiff testified:

"On or about August 21, 1916, I did have occasion to borrow $13,500 from the defendant, the First National Bank of El Paso. The circumstances under which that money was borrowed were just this, the price of the United Verde Extension stock was rather depressed at that time, rather low, and Mr. Bagwell came in and called my attention to the fact, and he said he thought it was an awfully good buy, and I, knowing what I did in regard to the property, having been in the property, and knowing the actual metallic value behind the stock, why, I told him I thought myself it was an awfully good buy, but I didn't care to buy the stock on margin. He said, well, that the First National Bank would lend me the money if I didn't care to buy it on margin, that they had told him that they would handle some of his customers' notes, and that he would —that they would be glad to carry my note on a basis, for the 500 shares, of $13,500. So I told Mr. Bagwell that if they wanted to carry my note, and the actual stock would be attached to my note, I would be glad to have him buy for me 500 shares of stock, but I wouldn't buy any other way. So he purchased the stock for me, and the loan was negotiated at the First National Bank. I signed a note payable to the order of the First National Bank for $13,500 on that date, and attached the 500 shares of stock in the United Verde Extension Mining Company to the note. At the time I attached that stock to the note, I made a memorandum of the numbers of the certificates and how much each represented in the company. I have a list I took from my record book, which is as follows: 'Certificate A–15941, 50 shares; certificate A–6109, 150 shares; certificate A–6213, 100 shares; certificate 1382, 100 shares; certificate 1418, 100 shares.' I do not know to whom those certificates were payable on their face. I looked at the in-

⚖For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests.and Indexes

dorsement to see they were properly indorsed on the back, which they were, indorsed in blank. By a blank indorsement I mean that it is just like a bare certificate, practically; the party to whom it is transferred is left blank. That is the customary way to transfer certificates. It was customary in El Paso at that time to pass the ownership of the stock by the delivery of certificates indorsed in blank; that is done every day. That has been customary ever since I can remember, ever since I have been in the banking business, and was prior to August 21, 1916, and since then. I did say that I looked to see that the indorsements on the certificates were proper, and I saw that the name which appears on the face of the certificates, to whom the stock was issued, was the same as the name indorsed in the blank assignment on the reverse side. I checked to see it was correct. The company that issued this stock was the United Verde Extension Mining Company. It is not a Texas corporation, and their property is located at Jerome, Ariz. The par value of the stock was 50 cents per share. I attached the 500 shares of stock to the note for $13,500, and delivered it to Mr. Bagwell. This [referring to note] is the note I signed on that day, and to which the stock was attached. The indorsement 'Bagwell Company, C. L. Bagwell,' was not on the note when I surrendered it, and I did not authorize that indorsement on the back of the note."

Counsel for plaintiff introduced and read in evidence the following note, Exhibit 1:

"El Paso, Texas, Aug. 21, 1916. $13,500.00.

"On demand after date —— promise to pay to the order of the First National Bank of El Paso, Texas, at its office thirteen thousand five hundred and no/100 dollars for value received with interest at the rate of 8 per cent. per annum, from date, with ten per cent. additional on amount unpaid, if placed in the hands of an attorney for collection, having deposited with said bank as collateral security for payment of this or any other liability or liabilities of ours to said bank, due, or to become due, or that may be hereafter contracted, the following property viz.: 500 U. V. X. attached, * * * (with power of sale, etc.) All indorsers and parties hereto jointly and severally waive protest, and suit and agree that the time of payment of the note may be from time to time extended by any one or more of us and without the knowledge or consent of any of the other of us, the liability of all parties to remain unchanged.
"[Signed] A. F. Kerr."

No. 17420 Due (pencil notation 11/21/16). Pencil notation: Int. $63.00.

Marked "Paid," with the stamp of the First National Bank, September 11, 1916.

On the back of the note appears the following indorsement: "Bagwell Co. C. L. Bagwell."

Canceled documentary stamps for $2.72.

"At the time I executed this note I attached the certificates of stock to the note, and delivered the whole thing to Mr. Bagwell to take to the First National Bank, and he left my office with the note and with the stock attached. After the execution of this note, I had occasion to call at the place of business of the First National Bank; it was about September 3, 1916. I think—somewhere between

the 1st and the 4th. At that time I discussed the matters in connection with the note with Mr. Kayser, the vice president. I believe Mr. Kayser was cashier at that time, but I am not sure of that. If he was vice president at that time, he was active vice president, but he may have been cashier, I don't remember about that. I have been personally acquainted with Mr. Kayser about 13 years, I think. During all of that time he has been connected with the First National Bank of El Paso, Tex. He has been connected with that bank ever since I have known him. Part of the time he was vice president, and I don't know but what part of the time he was assistant cashier, I don't know for sure. During that time I had occasion to find, in the course of my dealings with him, that he customarily assumed or took charge of the extension of notes, or their payment, or the collection of them; that was part of his daily conduct in that bank. In the conversation I had with Mr. Kayser, on or about the 3d or 4th of September, 1916, I told him I was going away on a trip to Arizona, and would be gone about a week, or a little longer possibly, and I called his attention to the fact that I had a note there for $13,500, secured by 500 shares of United Verde Extension stock. I told him that I was uneasy about the stock in the bank, and I told him, if I went over there on this trip, would he promise me he wouldn't let any one else but me take that stock up? I asked him two or three times, I says, 'Edgar, if I go over in Arizona and leave my note, with that stock attached, will you not let any one else take that up but me?' and Edgar kind of smiled, and he kind of motioned that way, and he says 'Go on, Alfred' we are pretty good friends—he says, 'Go on, Alfred; don't worry; we won't let anybody take that stock up but you.' I says, 'All right; with that promise, I will go.' There was no further conversation there that I recall right now. As to whether I told Mr. Kayser that the stock attached to my note was my stock, at that time I didn't know that Bagwell's name was on the back of the note, and when I approached him I says 'Edgar, I have a note in favor of your bank for $13,500, secured by 500 shares of United Verde Extension stock.' That is the way I approached him. No, sir; I didn't tell him at that time that the stock didn't belong to Mr. Bagwell. After this conversation with Mr. Kayser, I left El Paso and was gone about seven or eight days. My recollection is that I returned on the 12th day of September—it was sometime after the 11th. On my return I again called on the First National Bank of El Paso with reference to my note. I got back one afternoon after the close of the business day, and the next morning early I went down to the First National Bank. I think I talked to Mr. Wise, not Wise, but Wyatt—I don't know whether it was Mr. Wyatt or Mr. Kayser. I had made inquiry, and found my note had been taken up by Mr. Bagwell. * * * Bagwell ran a brokerage office, and did business under the name of C. L. Bagwell & Co., was a dealer in stocks here, and had bought some of the United Verde Extension stock. It is transferable on the books of the company; that is the way it is transferred. I hadn't had this stock transferred upon the books of the company. My name did not ap-

pear in any way on that stock, and any one else coming into possession of the stock wouldn't know, unless I told them so, that I had any interest in it at all."

"When I stated that this stock was transferable on the books of the company, that means that the holder of stock indorsed in blank can fill in his name in the assignment, and then send it to the company and have new certificates issued to him. In dealing with these stocks, it is customary to pass stock freely from hand to hand until it reaches the hands of some one who expects to hold it a good while. Unless it is dividend paying stock, some time it is out for months and months before it is reissued. I did not make demand on the company for more stock because it would have been useless. I had no right, as I saw, to demand of them. I didn't have the certificates to deliver to them in lieu of any new stock, and it would have been useless to ask it.

"Yes, sir; I bought this stock in question from Bagwell, on the occasion I have testified. I paid for it by giving him my note for $13,500 and my check for the difference. Yes, sir; I gave him that note and my check for the difference of the purchase price. Mr. Bagwell was to take the note with stock attached to the First National Bank, and he was to have the money that the bank paid out on the note. I never got that money."

E. F. Gillette, a witness for defendant, being duly sworn, testified as follows:

"My name is E. F. Gillette. I am employed at the First National Bank, and have been there about seven years. I was in the bank in August, 1916. I was handling the notes at that time. I handled this note (referring to Exhibit 1) in the First National Bank. This note was presented at the discount window by Bagwell Company, with Mr. Kayser's O. K. on it, so I credited the account of Bagwell Company and took the note in. I saw the name Bagwell and Bagwell Company written on the back of the note, that was on there when the note was presented for credit. That note was presented to me by Bagwell Company. I knew Mr. Bagwell, and I am not sure whether he presented it in person, but my recollection is he did. I entered the amount of the note, $13,500 in his passbook, and took the note in; by that I mean that I gave him credit in the bank for that amount of money, the proceeds of that note. The figures written in pencil, due 11/21/16, I think were written on there by me; yes, I put that on. I put that on the day I took the note in, and gave this man credit for it. I am not sure whether at that minute or not. It is customary in that department, when a demand note was taken in by the bank, that the interest was collected every three months, and I put those pencil figures on there so I could make a record of the note, and when to collect the interest. In other words, the note, by its terms, is payable on demand, and it is customary in that bank on those kind of notes to collect the interest every three months, and that was my idea in putting that on there. I wrote that in pencil because in case the interest was paid and it was agreeable to the bank to extend the note, I could erase the figures. Bagwell Company

paid the note; in other words, the same people that presented the note and got credit for it came back and paid it off. He was a customer of the bank. I did not know that Mr. Kerr had any interest in that stock attached to that note. Yes; I knew Mr. Kerr had given that note."

Cross-examination: "I didn't know whether that was Mr. Bagwell's stock or not. At that time, when the note was brought in, I supposed Mr. Kerr was speculating in that stock, and made the negotiations through Mr. Bagwell. No, sir; I didn't know whether that was Mr. Kerr's stock; I didn't know whether it was or not. This is Mr. Kerr's signature on the note. I knew Mr. Kerr was the maker of the note, and that the stock was attached to it, but I didn't make any conclusion as to whether it was Mr. Kerr's stock or not; I simply handled it as a regular note there in the bank. Mr. Kayser's O. K. was on that note; by that I mean he had approved the loan. I was under the authority of Mr. Kayser at that time, and I had no authority myself to approve loans. Whatever Mr. Kayser said about the collection of notes went, as far as I was concerned. I have been in the banking business about seven years with the First National Bank. From my experience as a banker, one who signs his name as an anomalous indorser on the back of a note, on which he does not appear as maker, is regarded as liable for the note. As to whether such a person was regarded by the bank customarily as a surety on the note, rather than as a principal, I think when we take notes in at the bank, if a man indorses a note, he is regarded as a surety, yes. I don't know how long Mr. Bagwell had been a customer of the First National Bank, but for six or eight months before that. As to whether he was dealing extensively with the bank during that time, well, I didn't have anything to do with his account, but I think his account was fairly active, however. I had had several transactions with him during this time. I didn't know what kind of deals he was handling; all I did was accept the note after the officer's O. K., and make a record of it and collect. I didn't know whether he was buying stock in this way for customers of his, or whether he needed the money. Yes; I knew he needed money pretty badly about that time. I don't remember the date they suspended business, whether on September 11th, or the day before that, I just remember they went out of business. I don't know whether it was on the day they came for the stock, or the day before that. I think I did personally attend to this matter of allowing Bagwell or Bagwell Company to pay off the note and take up the stock. I don't see my brand on it anywhere, but I think I did. It was not in my line of duty to demand payment of notes such as this was. No, sir; I made no demand on Mr. Kerr or any one else for the payment of this note. The fact simply is that Mr. Bagwell or some one from his office came in and paid us $13,563 and took this note and the stock. As to whether I asked Mr. Kayser whether it was all right to let them do that at the time, I think he was out of town at that time."

Plaintiff sought recovery upon two grounds: First, that the bank converted the certificates

of stock; second, that the bank agreed to hold said certificates for him, and not to deliver to others, which agreement it breached and lost him his stock. Defendant pleaded general and special exceptions and—

"it answered by general denial, and specially denied that it had made any loan to plaintiff, or that it received from, him as collateral the shares of stock set up in his petition, and averred that the stock received by it came to it in the regular course of business with a customer, and that it did not know at that time that the plaintiff owned the same or had any interest therein; that if any of its officers agreed to hold said certificates for plaintiff, and not to permit any other person to come into possession of same, it was purely gratuitous, and wholly and totally without consideration; that they had received no benefit therefrom; that its right in and to said stock and the control and disposition of same had long been fixed prior to such agreement or understanding, and that such an agreement, if made, could not be complied with, as it was its duty to deliver said shares of stock to the one depositing same on his proper demand; that it could not refuse under the contract under which it secured such possession to deliver same; that if any agreement was made to hold certificates for plaintiff it was not binding upon it, and not within the scope of liability, nor within the duty of the officers of the defendant; that same was never ratified by defendant and wholly unauthorized; that the said certificates of stock were duly indorsed and subject to hypothecation by the holder thereof; that same were received·in due course of business as a basis of credit to Bagwell under contract duly entered into, and upon the performance of said contract by said Bagwell said stock was redelivered to him, as defendant was obligated to do; that the plaintiff was not known in the transaction, and had nothing to do with the same; that if he was the owner thereof he had by the indorsement put same in such condition as they might be used by the holder and by his act in the premises is estopped from denying the consequences thereof.

"The cause was tried to a jury, and submitted by the court upon one special issue, which was as to the value of the stock.

"Judgment was entered in favor of plaintiff for the sum of $8,810.50, with 6 per cent. interest from April 13, 1920."

First assignment:

"The court erred in entering judgment herein in favor of the plaintiff because said judgment is based upon the testimony of the plaintiff, Kerr, to the effect that in September, 1916, and after the bank had advanced money on the note in question to C. L. Bagwell, and placed same to his credit E. W. Kayser, an officer of defendant bank, promised him that he would not allow any one to take up said collateral. The action is based upon the failure to keep this promise, and it is herein submitted that the failure so to do could not be made the ·basis of recovery, and the bank incurred no· liability by reason of allowing Bagwell to take up said note and resume possession of the collateral attached thereto. The rights of the bank and Bagwell became fixed long before this al-

leged promise was made, and these rights so fixed could not be changed in the manner as testified by the plaintiff. The· promise, if made, was wholly and entirely without consideration and not binding upon the bank, and in these respects the judgment of the court is and was contrary to the law." Submitted as a proposition.

And the second assignment charges error in permitting plaintiff to testify over objection that Kayser promised that he would not allow any one else to take up the stock. Upon the grounds:

First. "The evidence was immaterial, be-.cause it appeared that the contract had been made between the bank and Bagwell. The rights of the bank in and to the collateral in question had been fixed, and same could not be varied or changed by the promise of an officer of the bank, because it was beyond the power of any officer of the bank."

Second. "Bagwell being an original maker of the note, the contract was binding upon the· other maker, and the bank was within its rights in permitting· him to pay off the note and secure the return of the collateral to himself."

True, the rights of the bank to hold both Bagwell and Kerr liable for the payment of the note had become fixed, and its right to hold the shares of stock pledged as security was equally fixed, and it was beyond the power of any officer to release it, but, the question here is: To whom should the bank surrender the shares of stock upon payment of the note? If the testimony of Kerr did not tend to prove that the bank had no lawful right to surrender the shares of stock to Bagwell, in that it did not tend to notify the bank of that fact, then it should have been excluded, and, if the testimony being admitted did not add anything to the whole of the evidence constituting the proof that the bank did ·not have the lawful right to deliver the shares of stock to Bagwell then the propositions of law enunciated in the first assignment rule this case. As we view the facts the plaintiff delivered the shares of stock to Bagwell, making him his agent or trustee, with authority to pledge them as security for the loan, and was the apparent owner thereof.

[1] The rule applicable to such state of facts is that when one dealing with the apparent owner has notice of the rights of the true owner, he acquires no better title to the stock than the apparent owner can transfer. Roberts v. Yarboro, 41 Tex. 449; Jones on Collateral Securities, § 474, p. 561; Texas Banking & Ins. Co. v. Turnley et al., 61 Tex. 365; Nelson v. Davis King, 25 Tex. 656.

[2, 3] In cases tried before a jury, questions not submitted to the jury will be presumed to have been found by the court in favor of the judgment, if there is any evidence to support such conclusion. That the testimony objected to did tend to establish the true ownership of the stock, and to give the bank notice

of the fact, there can be no question, and in this statement of plaintiff that he did not want Kayser to let any one else take up his note and stock, taken in connection with the fact that Kerr's name was the only one upon the face of the note, and that the note contained a description of the stock and other circumstances detailed by the witnesses, etc., were sufficient to put Kayser on notice that he (Kerr) was the true owner of the stock.

[4] The third is that—

"The contract having been made with Bagwell, an original maker of the note, the bank could not refuse to permit him to pay off the note and take up the collateral because, Kerr, having delivered the note and stock in question to Bagwell, the bank could presume that he (Bagwell) had the right to handle them, and after-acquired information could not affect the right of the bank."

. The bank had the right to presume that Bagwell had the right to pledge the stock, he in fact had the right; and the bank was in lawful possession of the stock, as a pledge to secure the payment of the note, but the after-acquired information was that Kerr was the true owner of the stock, and that the stock, upon payment of the note, should be delivered to Kerr, and not to Bagwell, and if notice to Kayser was legal notice to the bank of the fact, the bank, by delivering to Bagwell, has converted the stock and is liable. Roberts v. Yarboro, supra.

[5, 6] That notice to the cashier is notice to the bank is settled by the decisions, but if there is doubt as to whether Kayser was the cashier at the time, because of the uncertainty of the testimony to that effect, Kerr testified that he thought Kayser was the cashier at he time he told him not to let any one take up this stock, then the testimony is uncontradicted that Kayser had general supervision of the business embracing the transaction, and for that reason notice to him was notice to the bank. Wade on the Law of Notice (2d Ed.) § 683b; Rosenberg v. Bank, 27 S. W. 897; Memphis Cotton Oil Co. v. Gist, 179 S. W. 1090.

Assignments 5 and 6 are to the same effect, and are overruled for same reasons.

The eighth is that there is no proof of loss.

[7] It is admitted by the appellant that, if liable at all, it was liable for the value of the stock on September 11, 1916. The value of stock converted, at the time converted, less the amount of the note, was the measure of damages. And there is direct and positive evidence of the value of the stock on the date that it was delivered to Bagwell. Roberts v. Yarboro, 41 Tex. 449; King v. Bank, 159 S. W. 433.

Believing that the record discloses no error, the cause is affirmed.

WALTHALL, J. (dissenting). I do not concur in the conclusion reached by the majority that the bank had such knowledge or notice of Kerr's sole ownership of the stock certificates as to make the bank liable as a converter of the stock. The opinion is based on the theory that the bank had knowledge of Kerr's sole ownership of the certificates when Bagwell paid the note, and that, by reason of such notice, the bank was liable to Kerr for the value of the certificates for having delivered the certificates to Bagwell. I am of the opinion that the evidence found in the record wholly fails to show such notice. I am further of the opinion that Bagwell stood in the relation of an original promisor or surety on the note, and he, having deposited the note and the certificates in the bank, and having himself paid the note, was entitled to receive the certificates from the bank, and that Kerr, having attached the certificates to the note as security for its payment, the bank could not be held to have converted the certificates as the property of Kerr, by reason solely of its having delivered the certificates with the note to Bagwell when Bagwell discharged the note, in the absence of satisfactory evidence that the bank knew that Kerr owned the stock certificates.