**CITY NATIONAL BANK IN WICHITA FALLS, Appellant,**

v.

**James P. KIEL, Appellee.**

No. 16222.

Court of Civil Appeals of Texas.

Fort Worth.

June 9, 1961.

Rehearing Denied July 14, 1961.

2. Now V.A.T.S. Probate Code, § 160.

Bullington, Humphrey, Humphrey & Fillmore, and Leslie Humphrey, Wichita Falls, for appellant.

Thornton & Thornton, Olney, Johnson & Browning, Wichita Falls, Witts, Geary, Hamilton, Brice & Lewis, Joseph W. Geary, Jr., and W. S. Barron, Jr., Dallas, for appellee.

RENFRO, Justice.

The appellee, James P. Kiel, instituted suit against the appellant, City National Bank in Wichita Falls, in the district court of Wichita County, alleging the conversion of stock certificate A–60 of the Alaska International Corporation for 12,500 shares. The court entered judgment upon the jury verdict for the sum of $49,500, and, in addition, allowed plaintiff attorney's fees in the amount of $8,000. Defendant has perfected its appeal.

Plaintiff testified that in October, 1958, he was in dire need of $5,000. His friend Clopton was manager of the credit department of defendant Bank. He visited Clopton at the Bank and inquired as to the best officer in the Bank from whom to seek a loan. A day or two later Clopton called plaintiff and told him to go to Milburn, a Vice President of the Bank. Milburn was fifth ranking officer in the Bank and was a member of the defendant's loan committee. Plaintiff called on Milburn on the morning of October 31, 1958, at Milburn's desk in the Bank. Plaintiff took with him certificate No. A–60 which represented 12,500 shares of stock in the Alaska International Corporation. Plaintiff laid the certificate on the desk and told Milburn what he needed. Milburn said, "I will see that you get this loan if you will give me a thousand shares of that stock." Plaintiff refused. Milburn then asked, "Well would you give an option to buy 1000 shares of stock at $2.50 per share in lieu of interest?" Plaintiff agreed. Milburn then instructed plaintiff to be in Milburn's office that afternoon or the next morning. When he went to Milburn's office Milburn had all papers prepared. Plaintiff signed the agreement giving an option for 1,000 shares, the note, and "a stock power" and received a deposit slip for $5,000. He did not examine the note or deposit slip other than to verify the amount.

He had no idea the loan was other than a loan from the Bank. Nothing was said to him by anyone to lead him to think otherwise.

Defendant offered evidence that Milburn checked on the stock (after his first conversation with Clopton), told Clopton it was not bankable security but advised Clopton it might be worth a risk. Clopton and his wife decided to make the loan, but, being close freinds of plaintiff, did not want him to know the source of the loan. Mrs. Clopton drew her check in the amount of $5,000. Clopton delivered it to Milburn. Milburn's secretary procured a cashier's check payable to plaintiff, shown to have been purchased by Milburn "Agent and Trustee." The cashier's check was endorsed by plaintiff and it was deposited to his account. The note was payable to an undisclosed payee, at the office of the City National Bank. The loan agreement was addressed to Milburn, "Agent and Trustee." The stock power was executed in blank.

It is undisputed that plaintiff was not informed that the money came from the Cloptons. Milburn testified he told plaintiff the money came from an individual, whom he did not name, but plaintiff denied such statement was made or such information given him.

Although plaintiff testified he did not care where the money came from, in answer to the question, "You didn't rely upon his being a Vice-President of the City National Bank in handling this transaction?", plaintiff answered, "In handling the loan, yes, sir."

Later, plaintiff learned from Steel, President of Alaska International Corporation, that the corporation planned to exchange "J" certificates for the "A" certificate. Plaintiff informed Milburn of the proposed exchange, and told him not to exchange it for any stock that did not have plaintiff's name on it.

Steel sent four "J" certificates, in denominations of 5,000, 5,000, 2,000 and 500, to an attorney in Dallas, who retained the 500 certificate (with plaintiff's consent), and sent the other three to Milburn. Milburn, on March 23, sent the A–60 certificate to the Dallas attorney, who in turn sent it to Steel. The "J" certificates were issued by Alaska International Corporation, made out to Alaska International Associates, and were endorsed in blank. (Plaintiff had previously agreed to give the Dallas attorney 500 shares of the "A" stock. The judgment for plaintiff was limited to the value of 12,000 shares.)

Prior to the 23rd of March, plaintiff had orally and in writing instructed Milburn not

to release his "A" certificate without plaintiff's approval.

The transmittal letter from Milburn to the Dallas attorney was written on Bank stationery, and stated that the stock (the "A" certificate) was enclosed for cancellation of stock pledged as collateral for a loan, such stock being "owned by our customer, Mr. Jim Kiel." In a letter to the Registrar and Transfer Company concerning the "J" certificates, Milburn stated they should be "returned to me at the address below (City National Bank, Wichita Falls, Texas, Att. Ralph W. Milburn, V. President) as they are a part of our collateral file." Both plaintiff and defendant had account numbers with the brokerage firm of E. F. Hutton & Co. In all transactions concerning the Alaska stock the defendant's account number was used.

The President of defendant Bank testified Milburn could use his discretion in making loans up to $5,000 without taking the matter up with the loan committee.

In its first two points of error the defendant contends the judgment should be reversed and rendered because the loan and pledge transaction was not a Bank transaction, and grounds for estoppel to bind the Bank under the doctrine of apparent authority were neither proven nor submitted.

The jury found: 1. Milburn, Vice President of defendant, while acting in the course of his employment, made a loan of $5,000 to plaintiff. 2. In making the loan Milburn was acting in the course of his apparent authority for defendant. 4. Plaintiff delivered certificate A–60 to Milburn, Vice President of defendant, as collateral for the loan. 5, 6 and 7. Milburn converted said certificate while acting in the course of his authority, and while acting in the course of his apparent authority for defendant. 9 and 10. The cash market value of the certificate on March 23 was $43,750 and on April 1, $51,562.50. 14 and 15. That conversion of the stock was gross negligence on the part of Milburn and plaintiff should be allowed $35,000 as ex-

emplary damages. 16. At the time of the loan plaintiff was not informed that the proceeds were being obtained from an individual. 17. Milburn was not acting as agent and trustee for the Cloptons. 18. Plaintiff did not request Milburn to exchange the "A" certificate for the "J" certificates. 19. Milburn was not acting on plaintiff's instruction when he sent the "A" certificate to the Dallas attorney. 20. Plaintiff did not request Milburn to use his own judgment in making the exchange of "A" for the "J's". 21. Milburn did not act in good faith in mailing the "A" certificate to the Dallas attorney. 23. Plaintiff did not agree to exchange the "A" for the "J" certificates. 24. The loan of $5,000 was not made from Mrs. Clopton's own funds. 25. Plaintiff was not informed, prior to the exchange, that the "J" certificates were what is commonly known as investment stock.

The jury was instructed that by the term "apparent authority" is meant such authority as a reasonably prudent person, using diligence and discretion, in view of a principal's conduct, would naturally and reasonably suppose an agent to possess.

The above instruction was taken from Great American Cas. Co. v. Eichelberger, Tex.Civ.App., 37 S.W.2d 1050, 1052, error refused. The court held in the above case, "If a principal, acting through agents, invests such agent with the apparent authority, the acts of the agent in making a contract within the scope of his apparent authority is as binding upon the principal as if the agent possessed such authority", citing Clem v. Forbess, Tex.Civ.App., 10 S.W.2d 223.

As shown in the summary of the evidence, inquiry was made by plaintiff as to what officer he should see about the loan, and he was advised to see Milburn who admittedly had the authority and duty to make loans. All the discussions and transactions took place in the Bank's offices during banking hours. All written instruments were prepared by Milburn's secretary, who was a full-time employee of the Bank.

It is stated in 8 Tex.Jur.2d 377, sec. 191: "The doctrine of apparent authority of an agent has been given effect in a number of cases concerned with banking transactions. It has been held that when a bank opens its doors for business and places officers in charge, persons dealing with them in good faith, and without any notice of any want of authority in such officer, and the act done is in the apparent scope of the officer's authority, whether the officer was actually clothed with such authority or not, the party so dealing would be protected."

The record is voluminous. It would be impossible to set out all the evidence. We have, however, tried to summarize the gist of the evidence favorable to the jury findings.

■ We believe the question as to whether Milburn was acting within the scope of his apparent authority was settled by the jury finding that he was so acting. Under the record before us the matter was a fact question to be determined and there is sufficient evidence of probative force to uphold the jury finding. 8 Tex.Jur.2d 379, sec. 193.

Under the record and the jury findings we must agree the plaintiff was justified in thinking he was obtaining a loan from defendant and placing his stock certificate in the keeping of the defendant and that he should be protected from the conversion thereof.

■ By points of error 3, 4 and 5 the defendant contends (a) there was no conversion as a matter of law, and (b) the shares of ownership in Alaska International Corporation, represented by the "A" certificate on one hand, and the "J" certificates on the other, are the same.

It is defendant's contention that in pledge transactions involving stock, there can be no conversion by the pledgee by his disposition of the pledged stock, if he is in a position to return to the pledgor an equal number of shares of the same type and character as that pledged. It argues the "J" certificates which replaced the "A" certificate represented an equivalent number of shares of the same type and character.

In 18 C.J.S. Corporations § 428, p. 1025, it is stated: " * * * it is sufficient if he (pledgee) always has in his possession or under his control a sufficient number of shares of like kind and value to comply with his contract on the discharge of the debt or obligation by the pledgor, unless there is an agreement to the contrary, or unless the certificates pledged are specially marked so as to identify them and distinguish them from other shares of like denominations of the same corporations; and under this theory the pledgee may, by delivering to the pledgor other certificates of shares in the same company, being in all respects of the same series and equal in value to those which were the subject of the pledge, exonerate himself from more than nominal damages for the conversion of the certificate actually received in pledge."

Plaintiff contends the following evidence supports his contention that the "J" certificates were not equivalent to the "A" certificate: The only limitation on certificate "A", which was in plaintiff's name, was a limitation which forbade its transfer prior to April 1, 1959; according to the merger agreement between Alaska International Corporation and the Cataract Mining Corporation and the prospectus issued, the "J" certificates were controlled stock and nontransferable; the Alaska Corporation wired E. F. Hutton & Co., Wichita Falls, that the "J" certificates were investment stock and so recorded, that it was not transferable and could not be used as collateral; Hutton Company was warned of legal action if efforts were made to transfer "J" certificates; the "A" certificate was received from the corporation, and was made out in the name of plaintiff; the "J" certificates were made out in the name of Alaska International Associates, a partnership

composed of Steel and Alice Jayson, and said "J" certificates were sent from the partnership; plaintiff could have sold the "A" certificate; as owner of said certificate he was not issuer, underwriter or dealer; "A" stock was being sold at the pertinent time hereto; Alaska International Associates was, under Sec. 77b(4, 11), Title 15 U.S.C.A., an issuer; thus, the purchaser of "J" stock would be an underwriter; if plaintiff had accepted the "J" stock an attempted sale by him on the open market would not have been an exempt transaction under Sec. 77d; the "J" certificates had not been registered with the Securities and Exchange Commission; when Hutton & Co. attempted to have the "J" certificates transferred, the Registrar and Transfer Company returned them with the notice that said certificates had been acquired by Alaska International Associates for investment purposes only; and Alaska International Corporation wired Hutton & Co. that the "J" certificates were in the name of Alaska International Associates, were investment stock, recorded as such, were not transferable and could not be used as collateral.

We think the evidence sufficient to show that the "J" certificates did not represent an equivalent number of shares of the same type and character as the "A" certificate.

██ Defendant, in points 6 and 7, says there was no conversion as a matter of law, Milburn having sent certificate A–60 to Alaska Corporation for cancellation and exchange, leaving plaintiff's rights of the ownership in the corporation, as evidenced by said certificate, unimpaired.

The evidence shows that defendant had sent the "A" certificate in for cancellation and had failed in efforts to have it returned.

The general rule in Texas is stated in 42 Tex.Jur. 514, sec. 7: "A share or shares of corporate stock (that is an interest in a corporation) may be the subject of conversion for which an action can be maintained. Though a stock certificate is merely evidence of the stock itself, a wrongful detention thereof without the consent of the owner is a conversion of the certificate as distinguished from the stock; and an action for conversion of the certificate can be maintained although it was unindorsed." See also Hoad v. Winchester, Tex.Civ.App., 279 S.W. 875; Sandor Petroleum Corp. v. Williams, Tex.Civ.App., 321 S.W.2d 614; Baker v. Wasson, Sup., 59 Tex. 140.

██ In points 8 through 11 the defendant urges the court erred in rendering judgment for damages based on conversion because Milburn, in transmitting the certificate for exchange, performed an act consistent with his rights as pledgee, and the evidence is insufficient to show a conversion.

During February, plaintiff told Milburn not to release the "A" certificate until plaintiff could examine the "J" certificates. He told Milburn that Steel could not be trusted. He showed Milburn a newspaper clipping which recited that Steel and others had been permanently enjoined by the Securities and Exchange Commission from further violating the Securities Act. Plaintiff had further communication with Steel, and subsequently talked again with Milburn. At that time Milburn still had the "A" certificate on his desk. Plaintiff informed Milburn the "J" certificates were unacceptable, and repeated his instructions to Milburn not to release the "A" certificate unless and until he received stock in exchange in his name and approved by him. After this, Milburn, without plaintiff's approval, sent the "A" certificate to the Dallas attorney, who sent it on to Steel. The certificate was not returned to Milburn or plaintiff. Plaintiff never approved the "J" certificates.

"* * * since the pledgee impliedly agrees faithfully to hold the pledge until the conditions have been performed upon the faith of which the choses in action, goods, or personal chattels have been delivered to him the rule is general, if not universal, that the wrongful or unauthorized disposition of pledged property by the pledgee or his

agent so as to put it out of his power to redeliver it on payment of the debt which it secures is a conversion for which an action will lie." 41 Amer.Jur. 624, sec. 58; 14 Tex.Jur.2d 22, sec. 20; First National Bank v. Kerr, Tex.Civ.App., 225 S.W. 1106.

It is undisputed that certificate "A" was placed beyond the control of Milburn. Because of his action he could not redeliver it to plaintiff at the due date of the debt which it secured.

In points 12 through 15 defendant says plaintiff not having proven a tender sufficient to redeem the pledged stock, the court erred in rendering judgment for him.

■ Under the record in this case we think the plaintiff was not required to make a tender prior to bringing suit for conversion. The general rule is that where the defendant has committed some act which constitutes a conversion, a tender by the plaintiff of a debt due the defendant is not a condition precedent to the bringing of the action for the conversion. This is true where it is no longer within the power of the defendant to perform his part of the agreement. 53 Amer.Jur. 879, sec. 87. In 40 Tex.Jur. 841, sec. 4, it is stated: " * * although the creditor is willing to accept the money or thing due, tender is excused if the creditor has disregarded the rights of the debtor with respect to the obligation. * * * Nor is it necessary to tender payment of a debt where the creditor has rendered himself incapable of discharging his obligation to the debtor."

As heretofore stated, defendant, by surrendering the certificate, was not in position to restore certificate "A" to plaintiff, and hence had rendered itself incapable of discharging its obligations to plaintiff.

Points 16, 17 and 18 present the contention of defendant that there was no evidence or no competent evidence to support the jury finding of cash market value of certificate "A" either on March 23 or April 1.

The witness Neal, manager of the Wichita Falls office of E. F. Hutton & Co., testified his company is a member of all recognized stock exchanges. In the course of his duties he must keep familiar with market quotations of various stocks. He receives daily a pink sheet which contains information concerning the bid and asked prices of over-the-counter stock. The pink sheet is published by the National Quotations Bureau, Inc. The witness has used the pink sheet in his business and has found it to be reliable. The pink sheet is generally used and accepted in the course of a stockbroker's ordinary, daily dealings. The witness had occasionally made sales based on the bid and asked prices shown on the pink sheet. The sheet showed on April 1 quotation of $5 bid and $5.50 offered on Alaska International Corporation stock. Other bids and offers ranged from $5 to $6. The jury found the value of the stock as of April 1 to be $4.12½ per share. Milburn testified that in October, before the loan was made to plaintiff, he ascertained that the value of the stock at that time was from $2.50 to $3 per share.

■ Defendant argues that the pink sheets were inadmissible and cites in support of its contention Baglin v. Earl-Eagle Mining Co., 54 Utah 572, 184 P. 190, which so holds. The rule regarding such evidence seems to be different in Texas. In Texas & Pacific Ry. Co. v. Donovan, 86 Tex. 378, 25 S.W. 10, a witness testified to the market value of sheep in Chicago on a given day. His information was derived from trade journals and telegrams received from Chicago almost daily at the time. The court held the testimony was admissible. It is stated in 23 Tex.Jur.2d 463, sec. 321, that published market reports are admissible on the issue of value where they are shown to be credible. We believe the testimony of the witness established the credibility and reliability of the reports to which the objection was made.

In points 19, 22, 23, 24 and 25, defendant attacks the admission of certain evidence.

We fail to find reversible error in the rulings of the court.

 In points 20 and 21, defendant contends the court erred in rendering judgment against it in the amount of $8,000 as attorney's fees for plaintiff. We find no statutory provision for allowance of attorney's fees in a case of this nature. There was no contractual obligation for payment of attorney's fees. Under authority of such cases as Closner v. Chapin, Tex.Civ. App., 168 S.W. 370; Landa v. Obert, 45 Tex. 539; Wm. Cameron & Co. v. American Surety Co., Tex.Com.App., 55 S.W.2d 1032; and Choate v. Murphy, Tex.Civ. App., 125 S.W.2d 413, we hold the court erred in rendering judgment against defendant for attorney's fees.

Plaintiff complains of the action of the court in disregarding the jury finding that Milburn was grossly negligent in converting the stock certificate, and in denying plaintiff $35,000 exemplary damages. After studying all the evidence in the statement of facts we have concluded that the trial court was correct in holding that the answer to the issue on gross negligence was without support.

 Generally, gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it. Southern Cotton Press & Mfg. Co. v. Bradley, 52 Tex. 587; Missouri Pac. Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408; Bolton v. Stewart, Tex.Civ.App., 191 S.W.2d 798; Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709. The evidence falls far short of meeting the above test.

We also overrule plaintiff's point complaining of the action of the trial court in giving defendant credit for the $5,000 note executed by plaintiff.

We sustain defendant's points of error Nos. 20 and 21.

All of defendant's other points of error are overruled.

We overrule all of plaintiff's points of error.

The judgment of the trial court is modified by the elimination of the $8,000 attorney's fees, and, as modified, is affirmed.